FIRST AGRICULTURAL NATIONAL BANK OF BERKSHIRE
COUNTY *vs.* STATE TAX COMMISSION.

Suffolk. March 7, 1967. — July 27, 1967.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, SPIEGEL, & REARDON, JJ.

*Taxation,* Sales tax, Use tax, Exemption, Agency of the United States, Intergovernmental immunity, National bank. *Constitutional Law,* National bank, Taxation. *National Bank. Equity Jurisdiction,* Declaratory relief. *State Administrative Procedure Act. Words,* "Agency."

A national bank could maintain a suit in equity against the State Tax Commission under G. L. c. 30A, § 7; c. 231A for declaratory relief as to the validity of a regulation issued by the commission subjecting purchases of tangible personalty by national banks to the Massachusetts sales and use taxes under St. 1966, c. 14, §§ 1, 2. [174–175]

A national bank is not an "agency" of the United States within St. 1966, c. 14, § 1, subsection 6 (d), so that sales of tangible personalty to the bank are not sales to such an "agency" exempt under subsection 6 (d) or § 2, subsection 5 (b), from the sales and use taxes imposed by §§ 1, 2. [176]

The legal incidence of the sales tax imposed by St. 1966, c. 14, § 1, is upon the vendor, even though the economic burden of the tax may be shifted to the purchaser, so that, within § 1, subsection 6 (a), the Constitution and laws of the United States do not prohibit application of such tax to sales of tangible personalty to a national bank [181]; CUTTER, J., concurring in the result, was of the opinion that the Constitution and laws of the United States do not prohibit application of such tax to such sales to a national bank irrespective of whether the legal incidence of the tax is upon the vendor or upon the national bank as purchaser, and that it was unnecessary to determine the matter of incidence. [196–197]

The incidence of the use tax imposed by St. 1966, c. 14, § 2, is upon the purchaser. [181]

Discussion of intergovernmental tax immunity and of the nature and functions of national banks in connection therewith. [182–193]

The Constitution of the United States does not prevent application of the use tax imposed by St. 1966, c. 14, § 2, to purchases of tangible personalty by a national bank. [193]

Immunity from the use tax imposed by St. 1966, c. 14, § 2, is not conferred by 12 U. S. C. § 548 (1964) on purchases of tangible personalty by a national bank. [196]

BILL IN EQUITY filed in the Supreme Judicial Court for the county of Suffolk on August 2, 1966.

The suit was reserved and reported by *Reardon, J.*

*Ronald H. Kessel (Alex J. McFarland* with him) for the plaintiff.

*David Berman,* Assistant Attorney General, for the State Tax Commission.

REARDON, J. This is a bill for declaratory relief under G. L. c. 231A and c. 30A, § 7, which came first before a single justice. The plaintiff, a national bank, seeks a binding declaration that it is exempt from the recently enacted Massachusetts sales and use tax, St. 1966, c. 14, §§ 1 and 2 (Act). Judicial review is also sought of emergency regulation No. 6 issued by the defendant State Tax Commission (Commission). The Commission demurred to the bill and, without waiving its demurrer, filed an answer. The parties have filed a statement of agreed facts constituting a case stated. The matter was reserved and reported without decision by the single justice.

The plaintiff is a national banking association organized under 12 U. S. C. § 21, et seq. (1964), with its principal place of business in Pittsfield. It is one of ninety national banking associations within Massachusetts. Since April 1, 1966, the plaintiff has paid sales and use taxes to its vendors on purchases of tangible personal property within the Commonwealth. The amount of these taxes totaled $575.66 during the period from April 1, 1966, to June 30, 1966. On March 28, 1966, the plaintiff requested from the Commission a ruling or emergency regulation that national banks are exempt from Massachusetts sales and use taxes. No ruling was received by the plaintiff pursuant to its request.

The Commission on May 31, 1966, issued emergency regulation No. 6, which ruled that "[t]he sale, lease, or rental of tangible personal property to national banks and Federal savings and loan associations is subject to the sales and use tax."[1] This regulation remains in full force and effect. No other regulation pertaining to the sale, lease or rental of tangible personal property to national banks and Federal savings and loan associations has been issued. The plaintiff will be unable to carry on its banking operations unless it continues to make purchases which by the provisions of emergency regulation No. 6 are deemed to be subject to the Massachusetts sales and use tax. Massachusetts vendors have refused to make retail sales of tangible personal property to the plaintiff unless it agrees to reimburse such vendors for the Massachusetts sales tax thereon.

## I.  THE COMMISSION'S DEMURRER.

We first deal with the Commission's demurrer which is based on the ground that the Act provides an exclusive remedy by which the question of sales tax liability may be raised. While § 1, subsection 22, provides that the tax abatement remedy encompassed by subsections 20–22 shall be "exclusive,"[2] it contains no reference as to the proper mode of review of regulations issued by the Commission. Lacking an exclusive mode of review, judicial review of any regulation by a suit for declaratory relief is authorized by G. L. c. 30A, § 7.  See *Westland Housing Corp.* v. *Commissioner of Ins.* 352 Mass. 374, 380–381.  The Commission apparently issued emergency regulation No. 6 pursuant to its regulation making authority.  G. L. c. 14, § 4.  Emergency regulation No. 6 also constitutes a "regulation" within the

---

[1] Emergency regulation No. 6 also states, "National banks and Federal savings and loan associations making sales of tangible personal property must collect the sales tax to the same extent as other vendors making such sales." We do not consider this portion of the regulation even though the plaintiff alludes to it several times in its brief. Neither the allegations of the bill nor the facts constituting a case stated raise the question of the applicability of the Act to sales made by national banks to its customers.

[2] See also § 2, subsection 11.

meaning of G. L. c. 30A, § 1 (5). See Curran & Sacks, The Massachusetts Administrative Procedure Act, 37 B. U. L. Rev. 70, 77–78. Our jurisdiction extends, at the least, to a review of the validity of emergency regulation No. 6. Curran & Sacks, *supra,* at 84. That regulation places in controversy the plaintiff's claim that it is exempt from the taxes imposed by the Act under subsections 6 (a) and 6 (d) of § 1, subsection 5 (b) of § 2, and under the Constitution and laws of the United States. The Commission's demurrer should be overruled.

The issue thus presented for our determination is whether the sales and use tax imposed by the Act can be applied to purchases made by the plaintiff and other national banks doing business in the Commonwealth.

## II. STATUTORY EXEMPTION.

Sales and use taxes.

Section 1, subsection 6 (d), exempts "[s]ales to the United States, the commonwealth of Massachusetts or any political subdivision thereof, or their respective agencies."[3] The plaintiff purports to be an "agency" of the United States and, therefore, exempt from the sales and use taxes. A statute granting an exemption must be strictly construed. "The burden of proof is upon the one claiming the exemption to show clearly and unequivocally that he comes within the terms of the exemption." *Milton* v. *Ladd,* 348 Mass. 762, 765, and cases cited. Consideration may be given to the interpretation of the Act expressed by emergency regulation No. 6 and other administrative regulations contemporaneous with the enactment of the law. See *Cleary* v. *Cardullo's Inc.* 347 Mass. 337, 343, and cases cited.

Without question, as contended by the plaintiff, national banks are subject to certain supervision by the Federal government. The same may be said of railroads, airlines, commercial carriers of mail, radio stations, and many other private concerns which enter into relationships with the gov-

---

[3] Section 2, subsection 5 (b), provides that the use tax provisions shall not apply to sales exempt from the taxes imposed under § 1 of the Act.

ernment of the United States and perform governmental services. That they do so does not in and of itself make them "agencies" of the United States. A national bank is essentially a privately owned corporation, privately managed and operated in the interest of its stockholders. Whatever role a national bank has in furthering the fiscal policies of the Federal government is incidental to its primary purpose of returning profit to its stockholders. See *National Labor Relations Bd. v. Bank of America Natl. Trust & Sav. Assn.* 130 F. 2d 624, 627 (9th Cir.). "Instrumentalities like the national bank . . ., in which there are private interests, are not departments of the Government. They are private corporations in which the Government has an interest." *Emergency Fleet Corp., United States Shipping Bd. v. Western Union Tel. Co.* 275 U. S. 415, 425–426.[4] Their status as private corporations will be more thoroughly explored below.[5]

In our view the Legislature intended "agency" to mean either a regularly constituted department of government or an entity which is wholly owned by the government and which exercises exclusively governmental functions. At best, the plaintiff is a creature of the United States and not entitled to an exemption as an "agency" of the United States. We therefore hold that purchases made by the plaintiff national bank are not exempt by virtue of either subsection 6 (d) of § 1 or subsection 5 (b) of § 2 of the Act as sales to an "agency" of the United States.

---

[4] "The government need not perform all its functions by the use of its property and the activity of its officers, but may establish agencies to these ends. Such an agency, created not for private gain but wholly devoted to governmental purposes and wholly owned by the United States, is as free from state taxation on its property and its activities as the government itself. ·. . . In the exertion of the powers conferred upon it by the Constitution, the United States may, in its discretion, erect corporations for private gain and employ them as its instrumentalities." *James, State Tax Commr. v. Dravo Contr. Co.* 302 U. S. 134, 163 (Roberts, J. dissenting).

[5] We reserve also for later discussion various judicial utterances that have characterized national banks as "agencies" or instrumentalities of the Federal government. See, e.g., *Owensboro Natl. Bank v. Owensboro,* 173 U: S. 664, 667–668; *First Natl. Bank v. Hartford,* 273 U. S. 548, 550; *Providence Inst. for Sav. v. Boston,* 101 Mass. 575, 584; *Central Natl. Bank v. Lynn,* 259 Mass. 1, 7–8; *Commissioner of Corps. & Taxn. v. Woburn Natl. Bank,* 315 Mass. 505, 506; *Squantum Gardens, Inc. v. Assessors of Quincy,* 335 Mass. 440, 444.

### III.  CONSTITUTIONAL EXEMPTIONS.

A.  Sales tax.

Since the plaintiff is not exempted under the terms of subsection 6 (d) of § 1 of the Act, can there be exemption in its favor under subsection 6 (a)? That provision exempts from the imposition of the sales tax "[s]ales which the commonwealth is prohibited from taxing under the constitution and laws of the United States."

The Commission contends that the sales tax is not imposed upon the purchaser, as alleged by the plaintiff, but rather is a tax upon the vendors who sell tangible personal property to the plaintiff. If the tax does fall on the vendor, that the economic burden of the tax may be passed on by the vendor to the plaintiff offends neither the sovereign immunity of the United States nor the laws of the United States relative to State taxation of national banks. *Western Lithograph Co.* v. *State Bd. of Equalization,* 11 Cal. 2d 156. *National Bank of Hyde Park* v. *Isaacs, Director of Rev.* 27 Ill. 2d 205. *Federal Reserve Bank* v. *Department of Rev.* 339 Mich. 587. *National Bank* v. *Department of Rev.* 340 Mich. 573, app. dism. 349 U. S. 934. See *Alabama* v. *King & Boozer,* 314 U. S. 1, 8–9. Any exemption the plaintiff may claim under subsection 6 (a) will be controlled by whether the purchaser or the vendor bears the legal incidence of the Massachusetts sales and use taxes. *Alabama* v. *King & Boozer,* 314 U. S. 1. *Curry, Commr. of Rev. of Alabama,* v. *United States,* 314 U. S. 14. *Kern-Limerick, Inc.* v. *Scurlock, Commr. of Rev. for Arkansas,* 347 U. S. 110, 121–122.

The legal incidence of a tax has been held by the Supreme Court of the United States to be determined by "who is responsible . . . for payment to the state of the exaction." *Kern-Limerick, Inc.* v. *Scurlock, Commr. of Rev. for Arkansas,* 347 U. S. 110, 121–122. This determination is not always easy because of the similarities existing generally in the structure of State sales taxes regardless of whether the

legal incidence of the tax is imposed upon the vendor[6] or upon the purchaser.[7]  The economic burden of the tax is almost universally passed along to the purchaser although practical considerations necessitate its collection and remission to the State by the vendor.  Notwithstanding these ambiguous aspects inhering generally in sales taxes, we confront the question of which party the General Court intended should bear the legal incidence or ultimate burden of the tax.

Our Act is neither a vendor tax nor a purchaser tax but a hybrid tax containing elements of both vendor and purchaser taxes.  See Dane, The New Sales and Use Tax Law, 51 Mass. L. Q. 239, 246–249.  The tax is in part a levy on the vendor for the privilege of selling at retail.[8]  The liability for the sales tax is based on three per cent of a vendor's "gross receipts" from all retail sales of tangible personal property rather than the amount of taxes actually collected from purchasers.[9]  St. 1966, c. 14, § 1, subsection 2.  Worthy of specific note is the liability of the vendor to make return of the tax to the Commonwealth for gross sales made by him of items where individual sales do not exceed eighteen cents.[10]  § 1, subsections 2 and 4.  On such

[6] In States in which the legal incidence of the tax is imposed upon the vendor, the legal basis of the tax is "for the privilege of engaging in such business" (see, e.g., Mich. Compiled Laws, 1948, § 205.52), or is a "Retailers' Occupation Tax" (see, e.g., Ill. Rev. Sts., 1965, c. 120, § 440).

[7] See Ohio Rev. Code & Serv., c. 5739.03.  See also 36 Maine Rev. Sts. Anno., § 1753: "The liability for, or the incidence of, the tax on tangible personal property provided by . . . [the sales and use tax] is declared to be a levy on the consumer."

[8] Statute 1966, c. 14, § 1, subsection 7 (a), provides that "[n]o person shall do business in this commonwealth as a vendor unless a registration . . . shall have been issued to him."  A vendor's failure to comply with the requirements of the statute may result in the revocation of his registration.  § 1, subsection 7 (c).

[9] Most States have held this to be true even though disparities occur due to a bracket collection system similar to that contained in § 1, subsection 4. De Aryan v. Akers, 12 Cal. 2d 781.  Stevens Enterprises, Inc. v. The State Commn. of Rev. & Taxn. of the State of Kansas, 179 Kans. 696.  W. S. Libbey Co. v. Johnson, State Tax Assessor, 148 Maine, 410.  Piedmont Canteen Serv. Inc. v. Johnson, Commr. of Rev. 256 N. C. 155.  F. W. Woolworth Co. v. Gray, 77 N. D. 757.  Smoky Mountain Canteen Co. v. Kizer, Commr. of Fin. & Taxn. 247 S. W. 2d 69 (Tenn.).  White v. Washington, 49 Wash. 2d 716.

[10] But see § 1, subsection 6 (t), exempting under certain conditions sales of tangible personal property through coin operated vending machines, the cost of which does not exceed ten cents.

items the purchaser does not reimburse the vendor for any tax whatsoever. The responsibility for payment to the Commonwealth is exclusively upon the vendor.[11] He is the "taxpayer" or person required to make returns and to pay the tax to the Commonwealth. See St. 1966, c. 14, § 1, subsections 9 and 10. See also § 1, subsection 17. The assessment and collection of unpaid taxes through both criminal and civil remedies may be made only against the vendor. § 1, subsections 15–19. Likewise, the tax abatement procedures provided by § 1, subsections 20–22, are applicable only to vendors.[12] Chapter 14, § 1, makes no provision permitting the Commonwealth to enforce the payment of the sales tax against a purchaser. Cf. N. Y. Consol. Laws, c. 60, § 1133; Ohio Rev. Code & Serv. § 5739.13.

The liability initially laid upon the vendor to remit the tax to the Commonwealth does not of necessity require the conclusion that the legal incidence of the tax is imposed upon him. A sales tax which by its terms must be passed on to the purchaser imposes the legal incidence of the tax upon the purchaser. See *Federal Land Bank* v. *Bismarck Lumber Co.* 314 U. S. 95, 99. See also *Alabama* v. *King & Boozer,* 314 U. S. 1, 9–10. The plaintiff argues that by virtue of § 1, subsections 3 and 23 of the Act, it bears the legal incidence of the tax. Subsection 3 provides that "each vendor in this commonwealth shall add to the sales price and shall collect from the purchaser the full amount of the tax imposed by this section."[13] Subsection 23 prohibits as unlawful advertising the holding out by any vendor that he will assume or absorb the tax on any sale that he may make. However, neither subsection 3 nor 23, singly

---

[11] But see, as an exception, St. 1966, c. 483, amending St. 1966, c. 14, § 1, subsection 3, which provides that the sales tax on motor vehicles and trailers be paid by the purchaser to the registrar of motor vehicles rather than to the vendor.

[12] For purposes of the use tax imposed by § 2, the assessment, collection, and abatement provisions of § 1 are applicable to purchasers. § 2, subsection 11.

[13] Section 1, subsection 4, contains a bracket system to facilitate collection of the tax from the purchaser. The statute also requires that the amount of the tax "shall be stated and charged separately from the sales price." § 1, subsection 5. See also § 1, subsection 1 (14) (c) (iv).

or together, imposes any sanction on a vendor who chooses not to charge the tax. His liability to the State remains at three per cent of his gross receipts whether or not he chooses to collect the tax from his purchasers.[14] The Commonwealth can proceed only against him for the collection of unpaid taxes. We are of the opinion that subsections 3 and 23 fall short of shifting the legal liability, or incidence, of the tax placed initially on the vendor to the purchaser.

There is no necessary inconsistency between imposing the legal incidence of a tax upon the vendor, yet recognizing a statutory right in the vendor to shift the tax to the purchaser. See Mich. Compiled Laws, 1948, § 205.73, as amended by PA 1949, No. 272 (Stat. Anno. 1950 Rev. § 7.544), construed in *National Bank* v. *Department of Rev.* 334 Mich. 132, 137. See also *Federal Reserve Bank* v. *Department of Rev.* 339 Mich. 587; *National Bank* v. *Department of Rev.* 340 Mich. 573, app. dism. 349 U. S. 934. The thrust of these cases is that the Michigan sales tax is upon the vendor notwithstanding the intent of the Legislature that the economic burden of the tax was to be passed on to the consumer and that such a requirement was imposed by administrative regulation. *National Bank* v. *Department of Rev.* 334 Mich. 132, 137.

We think our Act is clearly distinguishable from the North Dakota sales tax, urged by the plaintiff as "strikingly similar," reviewed by the Supreme Court of the United States in *Federal Land Bank* v. *Bismarck Lumber Co.* 314 U. S. 95.[15] That statute punished a vendor's fail-

---

[14] We believe that these subsections are aimed more at the cultivation of a happy relationship between the vendors and customers than at any mandate that the taxes be collected from the purchaser. The vendor at his option may add the tax to his selling price without being accused of a price increase. At the same time, the small vendor is not put at a competitive disadvantage with larger retailers who conceivably could increase their business volume by advertising a willingness to absorb the tax. See Dane, The New Sales and Use Tax Law, 51 Mass. L. Q. 239, 248.

[15] There, at p. 99, the court stated: "It is clear that the North Dakota statute makes the purchaser . . . liable for the sales tax. Section 6 of the Act requires the retailer to add the tax to the sales price and declares the tax to be a debt from the consumer to the retailer. Section 7 makes it unlawful for the retailer to hold out that he will absorb or refund the tax in whole or in part."

ure to collect the tax as a misdemeanor. See N. D. Century Code (Anno.) § 57–39–16 (5). The plaintiff's reliance on *Alabama* v. *King & Boozer,* 314 U. S. 1, 7, is misplaced for the same reason. The Alabama sales tax statute reviewed in that decision made a vendor criminally liable if he failed or refused to collect the tax from the purchaser. Alabama Code, 1940, Tit. 51, § 776. Other decisions cited by the plaintiff, see, e.g., *Avco Mfg. Corp.* v. *Connelly,* 145 Conn. 161, that have relied on cases such as *Federal Land Bank* v. *Bismarck Lumber Co.* and *Alabama* v. *King & Boozer* to impose the legal incidence of the tax upon the purchaser, are equally unhelpful. Nor do we agree with *Liberty Natl. Bank & Trust Co.* v. *Buscaglia,* 26 App. Div. 2d (N. Y.) 97. That decision is in conflict with a later case, *Pierce* v. *State Tax Commn.* 52 Misc. 2d (N. Y.) 10, 13, which indicates, contrary to the conclusion reached in the *Buscaglia* decision, that the incidence of the New York State sales tax is upon the vendor.

We conclude that the incidence of the sales tax is upon the vendor. The plaintiff, therefore, is not entitled to an exemption under § 1, subsection 6 (a) of the Act. See cases cited, *supra.*

B. Use tax.

The exemption in § 1, subsection 6 (a), for "[s]ales which the commonwealth is prohibited from taxing under the constitution or laws of the United States" is applicable also to the use tax. § 2, subsection 5 (b). In contrast to the sales tax, there is no doubt that the incidence of the use tax is upon the purchaser. The three per cent tax, designed to prevent the loss of sales tax revenue by out of State purchases, is imposed upon the storage, use or other consumption of tangible personal property within the Commonwealth. § 2, subsection 2. The purchaser or "user" is liable for the tax. § 2, subsection 3. It is his obligation to file a return and pay the tax. § 2, subsections 10 (a), 10 (c).[16] The provisions contained in § 1, subsections 15–

---

[16] Under certain circumstances, a vendor doing business in the Commonwealth who makes sales which are subject to the use tax is required to collect

22, relating to the assessment, collection, and abatement of the sales tax, are expressly applied to purchasers liable for payment of the use tax. § 2, subsection 11.

Our conclusion that the incidence of the use tax is upon the purchaser raises the question whether the Constitution and laws of the United States permit such a tax to be imposed upon the plaintiff and other national banks doing business within the Commonwealth. The plaintiff asserts that national banks are agencies and instrumentalities of the Federal government and as such cannot constitutionally be taxed by a State except as permitted by congressional legislation. *Central Natl. Bank* v. *Lynn,* 259 Mass. 1, 7–8. *Commissioner of Corps. & Taxn.* v. *Woburn Natl. Bank,* 315 Mass. 505, 506–507, and cases cited. *Owensboro Natl. Bank* v. *Owensboro,* 173 U. S. 664, 668. *Des Moines Natl. Bank* v. *Fairweather, Mayor,* 263 U. S. 103, 106. *First Natl. Bank* v. *Hartford,* 273 U. S. 548, 550. *Iowa-Des Moines Natl. Bank* v. *Bennett,* 284 U. S. 239, 244.

Virtually all of these decisions and the doctrine which they espouse rely ultimately on Chief Justice Marshall's noted opinion in *M'Culloch* v. *Maryland,* 4 Wheat. 316. That case arose when Maryland imposed a tax upon notes issued by banks not chartered by the State Legislature in an attempt to drive the second national bank from Maryland. This tax directly interfered with a function crucial to the success of the bank, for the issuance of notes was a principal means of obtaining capital to be utilized for loans or other profit making activities. Moreover, the tax was levied upon an institution to which Congress had delegated important governmental functions.[17] In holding the tax

the tax and give the purchaser a receipt therefor. § 2, subsection 4. Such a receipt relieves the purchaser from further liability for the tax to which the receipt refers. § 2, subsection 3. The amounts reimbursed by the purchaser to such vendors need not be stated in a return filed by the purchaser. § 2, subsections 10 (a), 10 (b).

[17] See Act of April 10, 1816, c. 44, 3 Stat. 266. For example, the United States owned twenty per cent of the capital stock of the second national bank. § 6. The President was empowered to appoint, subject to the approval of the Senate, five of the twenty-five directors of the bank. § 8. Notes issued by the bank were made legal tender for all Federal debts. § 14. The bank was

invalid, Chief Justice Marshall recognized the grave danger to the Federal government from a discriminatory State tax levied on an important fiscal agent of the United States. See 4 Wheat. 316, 431. The Chief Justice did, however, acknowledge that inherent power existed in the States to lay certain taxes on such an instrumentality. 4 Wheat. 316, 436. Unfortunately, this decision, as well as the later case of *Osborn* v. *The Bank of the United States,* 9 Wheat. 738, in which the court held unconstitutional a discriminatory Ohio tax levied upon the bank, established a doctrine of absolute intergovernmental immunity, regardless of the nature of the tax, which was to flower for the ensuing century. This doctrine was later referred to by Justice Frankfurter as a "web of unreality . . . [which] withdrew from the taxing power of the States and Nation a very considerable range of wealth without regard to the actual workings of our federalism." *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, 490.

The case of *Owensboro Natl. Bank* v. *Owensboro,* 173 U. S. 664, is to be read with this prior history in mind. There, in 1899, the Supreme Court held invalid a nondiscriminatory franchise tax of the State of Kentucky levied against a national bank created by the National Bank Act of 1863. The court, purporting to rely on its earlier decisions in the *M'Culloch* and *Osborn* cases, as well as in *Davis* v. *Elmira Sav. Bank,* 161 U. S. 275, held that a State is wholly without power to levy any tax upon national banks save that permitted by congressional act. No attempt was made to distinguish between the discriminatory taxes held invalid in the *M'Culloch* and *Osborn* cases and the tax levied by the State of Kentucky.

We do not believe we should be led by a blind reliance on stare decisis. The plaintiff cites no case in this century where the Supreme Court of the United States has struck down on constitutional grounds a nondiscriminatory State

made the depository of public funds of the United States. § 16. Upon the request of the Secretary of the Treasury, the bank was required to transfer public funds from place to place without charge. § 15.

tax on a privately owned enterprise which is alleged to be an instrumentality of the United States. On the other hand, the Supreme Court has in recent years curtailed sharply the application of the doctrine of implied intergovernmental immunity to instrumentalities of the Federal government. See *United States* v. *Allegheny County,* 322 U. S. 174, 176–177; Powell, The Waning of Intergovernmental Tax Immunities, 58 Harv. L. Rev. 632; and Powell, The Remnant of Intergovernmental Tax Immunities, 58 Harv. L. Rev. 757.

In addition, a metamorphosis has taken place in the nature and functions of national banks. There is little resemblance between the operation of today's national bank and that of the second national bank or of national banks at the time the *Owensboro* case was decided by the Supreme Court. It is thus our belief that the plaintiff's claim to immunity is to be judged according to contemporary conditions under principles enunciated in the more recent Supreme Court decisions relating to implied constitutional immunity of purported instrumentalities of the United States.

There has never been any doubt that a State cannot lay a tax upon the United States itself. *M'Culloch* v. *Maryland,* 4 Wheat. 316. *Mayo* v. *United States,* 319 U. S. 441. *United States* v. *County of Allegheny,* 322 U. S. 174. *Kern-Limerick, Inc.* v. *Scurlock, Commr. of Rev. for Arkansas,* 347 U. S. 110. Unfortunately there is no simple test for ascertaining whether an institution is so closely related to governmental activity as to become a tax immune instrumentality of the United States. *Department of Employment* v. *United States,* 385 U. S. 355, 358–359.[18] The appli-

---

[18] See *Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514, 522–524: "Just what instrumentalities of either a state or the federal government are exempt from taxation by the other cannot be stated in terms of universal application. But this Court has repeatedly held that those agencies through which either government immediately and directly exercises its sovereign powers, are immune from the taxing power of the other. . . .

"When, however, the question is approached from the other end of the scale, it is apparent that not every person who uses his property or derives a profit, in his dealings with the government, may clothe himself with immunity

cation of the principle of implied immunity "has required the observing of close distinctions in order to maintain the essential freedom of government in performing its functions, without unduly limiting the taxing power which is equally essential to both Nation and State under our dual system." *James, State Tax Commr.* v. *Dravo Contr. Co.* 302 U. S. 134, 150. Such a claim must be narrowly construed. "[T]he implied immunity of one government and its agencies from taxation by the other should, as a principle of constitutional construction, be narrowly restricted. For the expansion of the immunity of the one government correspondingly curtails the sovereign power of the other to tax . . . ." *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, 483.

The plaintiff's claim to implied constitutional immunity rests on the authority of decisions, cited previously, which characterized national banks as agencies and instrumentalities of the United States in construing their status under the National Bank Act.[19] That Act was entitled: "An Act to provide National Currency, secured by a Pledge of United States Bonds, and to provide for the Circulation and Redemption thereof." It authorized the formation of national banks to be employed as depositories and financial agents of the Federal government, but especially to be employed in facilitating the collection of internal duties and the transfer and disbursement of public moneys, and in fur-

---

from taxation on the theory that either he or his property is an instrumentality of government within the meaning of the rule. . . .

"As cases arise, lying between the two extremes, it becomes necessary to draw the line which separates those activities having some relation to government, which are nevertheless subject to taxation, from those which are immune. Experience has shown that there is no formula by which that line may be plotted with precision in advance. . . .

"But neither government may destroy the other nor curtail in any substantial manner the exercise of its powers. Hence the limitation upon the taxing power of each, so far as it affects the other, must receive a practical construction which permits both to function with the minimum of interference each with the other; and that limitation cannot be so varied or extended as seriously to impair either the taxing power of the government imposing the tax . . . or the appropriate exercise of the functions of the government affected by it."

[19] The Act was originally passed in 1863, Act of February 25, 1863, c. 58, 12 Stat. 665, but was amended considerably in 1864, Act of June 3, 1864, c. 106, 13 Stat. 99.

nishing a safe and uniform note circulation.   See *Van Allen* v. *The Assessors,* 3 Wall. 573, 582, 589–590.   The functions conferred upon the national banks were not unlike those granted to their earlier predecessors, the United States Bank and the second United States bank.   During the next half century the national banks played an important role in the establishment and supervision of national monetary policy.   In addition, the banks performed some minor services beyond their enumerated powers pursuant to an authorization to exercise "all such incidental powers as shall be necessary to carry on the business of banking."   Act of June 3, 1864, c. 106, § 8, 13 Stat. 101.

The Federal Reserve Act of 1913[20] reduced considerably the importance of national banks as fiscal agents of the United States.   Welch, State and Local Taxation of Banks in the United States, New York Tax Commission: Special Report No. 7, p. 209.   That Act, passed "To Provide for the establishment of Federal Reserve banks, to furnish an elastic currency, to afford means of rediscounting commercial paper, to establish a more effective supervision of banking in the United States, and for other purposes," placed upon the Federal Reserve System the responsibility of establishing and maintaining a national fiscal and monetary system.   In effect, the Federal Reserve System assumed in large part the functions and responsibilities conferred in earlier years on the first two banks of the United States and successor national banks.

The Federal Reserve System also assumed responsibility relative to the entire banking industry.   No longer are national banks the exclusive depository of government funds but Federal reserve banks and all member banks, regardless of whether they are State or national banks, are authorized to be Federal depositories.   § 15, 38 Stat. 265, as amended, 12 U. S. C. § 391 (1964).   Although national banks are required to be members of the Federal Reserve System, State chartered banks may also become members. § 9, 38 Stat. 259, as amended, 12 U. S. C. § 321 (1964).

[20] Act of December 23, 1913, c. 6, 38 Stat. 251.

Ninety-five per cent of all banks are insured by the Federal Deposit Insurance Corporation. *United States* v. *Philadelphia Natl. Bank,* 374 U. S. 321, 327. See § 5, 64 Stat. 876, as amended, 12 U. S. C. § 1815 (1964). This in itself subjects these banks to extensive supervision and control. "State member and nonmember insured banks are subject to a federal regulatory scheme almost as elaborate as that which governs the national banks." *United States* v. *Philadelphia Natl. Bank,* 374 U. S. 321, 327. Professor Davis has called Federal supervision of banking "[p]robably the outstanding example in the federal government of regulation of an entire industry through methods of supervision." 1 Davis, Administrative Law Treatise, § 4.04, at p. 247.

In exchange, it seems, for the transfer of governmental functions from the national banks to the Federal Reserve System, Congress broadened the powers of national banks to engage in general banking. Welch, *supra,* at pp. 33–35. Almost thirty years ago the Supreme Court remarked that "[t]hough the national banks' usefulness as an agency to provide for currency has diminished markedly, their importance as general bankers shows a constant growth." *Colorado Natl. Bank* v. *Bedford,* 310 U. S. 41, 48. This growth dates from the passage of the Federal Reserve Act of 1913. Although the National Bank Act had prohibited national banks from making mortgage loans, Act of June 3, 1864, c. 106, § 28, 13 Stat. 108, the authority to make such loans was allowed in 1913 and expanded thereafter. § 24, 38 Stat. 273, as amended, 12 U. S. C. § 371 (1964). See *Michigan Natl. Bank* v. *Michigan,* 365 U. S. 467, 471–472. The reduction of reserve requirements for "time" or "savings" deposits, see, e.g., § 19, 38 Stat. 270, as amended, 12 U. S. C. § 462 (1964), placed national banks in a better position to compete with State banks for savings accounts. The Federal Reserve Act also provided for the granting of fiduciary powers to national banks. § 11 (k), 38 Stat. 262, as amended. 12 U. S. C. § 92a (a) 1964. The McFadden Act of 1927 expressly allowed national banks to buy and sell securities other than Federal and State obligations. Act

of February 25, 1927, c. 191, § 2, 44 Stat. 1226, as amended, 12 U. S. C. § 24 (1964).

The sum total of the changes wrought during this century has been the assumption by the Federal Reserve System of the role of fiscal agent for the Federal government. The relegation of national banks to their present status as general commercial bankers makes any difference between them and their State chartered competitors hard to discern. The similarities between them are infinitely striking. Given a national bank and a State chartered trust company operating in the same community, one may know that both will have savings departments paying interest generally at an even rate. Both will engage in the business of commercial and real estate loans in competition. Both may have trust departments serving the same purpose. With the contemporary extension of the banking business into other allied fields both will compete in the area of similar sales and services. Both enjoy equal benefits from the protection of local and State government. Both are in business for the purpose of profit. In this highly mechanized day both will require expensive business machines either purchased in or without the State. Both will need real estate and attractive buildings in which to do business.

There are few dissimilarities. National banks are creatures of the Federal government in that they owe their very existence to congressional legislation. 12 U. S. C. § 21 (1964). They are required to be members of the Federal Reserve System. 12 U. S. C. § 222 (1964). The sole modern distinction of importance between the two lies in the fact that one is subject to Federal supervision, 12 U. S. C. §§ 21–215b (1964), while the other is supervised directly by the Massachusetts Commissioner of Banks under G. L. c. 167, §§ 1–11C.

We do not find these differences sufficient to exempt the plaintiff from the imposition of a nondiscriminatory tax of general application such as the use tax imposed by § 2 of the Act. That national banks were originally chartered by Congress is of historical interest but has little relevance in

the determination of whether intergovernmental immunity should exist. *Railroad Co.* v. *Peniston,* 18 Wall. 5, 34. That they are required to join the Federal Reserve System makes them no more indispensable vehicles for effectuating national fiscal policy than the State chartered members of the system. In view of the increasingly massive Federal control over all aspects of the national economy, and particularly commercial banking, supervision by the Department of the Treasury of what is otherwise a privately owned institution engaged in the pursuit of profit does not bring the plaintiff to the close relationship with the government necessary to imply immunity under the Constitution.

A comparison with the two recent instances in which the Supreme Court of the United States has granted an entity other than the United States status as a tax immune instrumentality reveals the weakness of the plaintiff's claim to immunity. *Standard Oil Co. of Cal.* v. *Johnson, Treas. of Cal.* 316 U. S. 481, involved an attempt by California to impose a tax on the privilege of distributing motor vehicle fuel on United States Army post exchanges. The court concluded, after a detailed examination of the activities of United States Army post exchanges, all of which were governmental in nature, that post exchanges "as now operated are arms of the Government deemed by it essential for the performance of governmental functions." 316 U. S. 481, 485. The holding of the court was not placed on constitutional grounds, the case being sent back for a further interpretation of the State statute in the light of the court's conclusion as to the status of post exchanges. Very recently the court held that the Red Cross is a Federal instrumentality for purposes of tax immunity. *Department of Employment* v. *United States,* 385 U. S. 355. It thus held invalid as applied to employees of the Red Cross a Colorado payroll tax designed to protect employment security.[21] After reviewing its extensive and almost all perva-

---

[21] In contrast to the status of employees of the Red Cross and other servants of the government which is peculiarly a matter of Federal concern, employees of national banks are expressly subjected to State unemployment laws. 26 U. S. C. § 3305 (c) (1964). See 26 U. S. C. § 3306 (c) (6) (1964).

sive relationship with the United States, Justice Fortas found that the Red Cross functioned "virtually as an arm of the Government."[22]

No contention can be made that the plaintiff functions as "an arm of the Government" as do the United States Army post exchanges or the Red Cross. Furthermore, there has been an unmistakable trend in recent Supreme Court decisions, many of which overrule earlier precedent, to deny implied constitutional immunity from State taxation to essentially private persons, both individual and corporate, who conduct businesses for profit and at the same time perform some governmental functions. In *James, State Tax Commr.* v. *Dravo Contr. Co.* 302 U. S. 134, the court sustained a West Virginia tax upon the income of a contractor derived from building locks and dams for the Federal government in that State. The cases of *Helvering, Commr. of Int. Rev.* v. *Gerhardt,* 304 U. S. 405, and *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, upset a century of precedents by permitting the application of the income taxes of each entity to employees of the other. The Supreme Court has held valid State sales and use taxes imposed upon contractors employed by the Federal government on a cost-plus-fixed fee basis even though the financial burden of the tax was passed on to the United States. *Alabama* v. *King & Boozer,* 314 U. S. 1 (sales tax). *Curry* v. *United States,* 314 U. S. 14 (use tax). See *United States* v.

---

[22] 385 U. S. 355, 359–360. In explaining why the Red Cross is a tax exempt instrumentality of the United States, Justice Fortas further stated: "Congress chartered the present Red Cross in 1905, subjecting it to governmental supervision and to a regular financial audit by the Defense, then War, Department. 33 Stat. 599, as amended, 36 U. S. C. § 1, et seq. Its principal officer is appointed by the President, who also appoints seven (all government officers) of the remaining 49 Governors. 33 Stat. 601, as amended, 36 U. S. C. § 5. By statute and Executive Order there devolved upon the Red Cross the right and the obligation to meet this Nation's commitments under various Geneva Conventions, to perform a wide variety of functions indispensable to the workings of our Armed Forces around the globe, and to assist the Federal Government in providing disaster assistance to the States in time of need. Although its operations are financed primarily from voluntary private contributions, the Red Cross does receive substantial material assistance from the Federal Government. And time and time again, both the President and the Congress have recognized and acted in reliance upon the Red Cross' status virtually as an arm of the Government" (footnotes omitted) pp. 359–360.

*Boyd, Commr.* 378 U. S. 39, 48–51. In *Oklahoma Tax Commn.* v. *Texas Co.* 336 U. S. 342, lessees of exempt Indian lands were held liable for State gross production and excise taxes on petroleum produced from such lands. More recently the court upheld a Michigan statute which imposed a real property tax on private parties using otherwise tax exempt property belonging to the Federal government. *United States* v. *Detroit,* 355 U. S. 466. *United States* v. *Muskegon,* 355 U. S. 484. *Detroit* v. *Murray Corp. of America,* 355 U. S. 489. The most striking of these Michigan cases is the one involving Muskegon. There the tax was sustained even though Continental Motors Corporation was using a government owned plant for the performance of government contracts without a lease or other cognizable property interest. "The vital thing," stated the majority, "is that Continental was using the property in connection with its own commercial activities. The case might well be different if the Government had reserved such control over the activities and financial gain of Continental that it could properly be called a 'servant' of the United States in agency terms." 355 U. S. at p. 486.

The "Michigan cases" suggest that only a "servant" of the Federal government may gain Federal immunity. Van Cleve, States' Rights and Federal Solvency, 1959 Wis. L. Rev. 190, 206. At the least, they establish the proposition that privately owned corporations organized for profit which perform some governmental functions are not thereby immunized from nondiscriminatory State taxes of general application. Well before these cases, Professor Thomas Reed Powell, in criticizing the absolute immunity doctrine, called for recognition that some governmental activity may be business activity and should not thereby be automatically withdrawn from State taxation. Powell, The Waning of Intergovernmental Tax Immunities, 58 Harv. L. Rev. 633, 651 ff. The coexistence of private and governmental functions has come to be recognized in other fields. For example, national banks have been held to be private corporations for various purposes of Federal law. See *United*

*States* v. *Philadelphia Natl. Bank,* 374 U. S. 321 (anti-trust laws); *United States* v. *First Natl. Bank & Trust Co.* 376 U. S. 665 (anti-trust laws). See also *National Labor Relations Bd.* v. *Bank of America Natl. Trust & Sav. Assn.* 130 F. 2d 624 (9th Cir.) (labor law). In an age of increased Federal involvement in all aspects of the national economy, recognition of the coexistence of private and governmental functions is necessary in order that the States may not be deprived of needed revenue. See generally Pierce, Tax Immunity Should Not Mean Tax Inequity, 1959 Wis. L. Rev. 173. This recognition would tend to prevent a benefit from running to an essentially private interest at the expense of the taxing government and without a corresponding benefit to the government in whose name the immunity is claimed. See *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, 483.

Such an approach also fosters a sound tax policy of equality which dictates that all business for profit within a State share the cost of government services provided to all. The importance of preserving this tax equality between business competitors was recognized by the Supreme Court in the "Michigan cases." "As suggested before the legislature apparently was trying to equate the tax burden imposed on private enterprise using exempt property with that carried by similar businesses using taxed property. . . . In the absence of such equalization the lessees of tax-exempt property might well be given a distinct economic preference over their neighboring competitors, as well as escaping their fair share of local tax responsibility." *United States* v. *Detroit,* 355 U. S. 466, 473–474. The plaintiff national bank enjoys the benefits of State and local services, the protection of the laws of the State, access to its courts, and the patronage of its citizens. That the plaintiff should escape a tax borne by its State chartered competitors, many of which are members of the Federal Reserve System, is manifestly unjust. Were it to be held that the use tax was not applicable to national banks the competitive disadvantage to which they would put their State

chartered competitors is as obvious as it is inequitable. Moreover, equality helps to slow the rate of bank mergers and other efforts of State chartered banks to escape State supervision as well as obtain a commercial advantage. See *United States* v. *Philadelphia Natl. Bank,* 374 U. S. 321; *United States* v. *First Natl. Bank & Trust Co.* 376 U. S. 665.

We find nothing in the Constitution of the United States or the recent Supreme Court decisions interpreting it to prevent the application of the use tax to purchases made by the plaintiff and other national banks doing business in the Commonwealth. "There . . . [is] no discrimination against the Federal Government, its property or those with whom it does business. There . . . [is] no crippling obstruction of any of the Government's functions, no sinister effort to hamstring its power, not even the slightest interference with its property. Cf. *M'Culloch* v. *Maryland,* 4 Wheat. 316." *Detroit* v. *Murray Corp. of America,* 355 U. S. 489, 495. In fact, were we to construe subsection 5 (b) of § 2, or subsections 6 (d) and 6 (a) of § 1, to exempt this small group of privately owned institutions which have neither the need nor the right to such protection, could it not be said that serious constitutional problems under the Fourteenth Amendment of the Constitution of the United States would arise?

### IV. EXEMPTION UNDER 12 U. S. C. § 548 (1964).

Finally, we confront the question whether the application of the use tax to purchases made by national banks violates any law of the United States. The plaintiff asserts that Rev. Sts. § 5219, as amended, 12 U. S. C. § 548 (1964), prohibits the imposition of such a tax upon a national bank. That provision, dealing with State taxation of national bank shares, provides in relevant part as follows: "The legislature of each State may determine and direct, subject to the provisions of this section, the manner and place of taxing all the shares of national banking associations lo-

cated within its limits. The several States may (1) tax said shares, or (2) include dividends derived therefrom in the taxable income of an owner or holder thereof, or (3) tax such associations on their net income, or (4) according to or measured by their net income, provided the following conditions are complied with: 1. (a) The imposition by any State of any one of the above four forms of taxation shall be in lieu of the others, except as hereinafter provided in subdivision (c) of this clause.'' (Subdivision [c] places certain limits on taxes measured by net income and requires that the tax rate not be higher on national banks than other financial, mercantile, manufacturing, and business corporations doing business within the State.)

We recognize that § 548 has been interpreted to be the extent to which Congress has permitted State taxation of national banks. *Commissioner of Corps. & Taxn.* v. *Woburn Natl. Bank,* 315 Mass. 505, 506–507, and cases cited. *Owensboro Natl. Bank* v. *Owensboro,* 173 U. S. 664, 668–669. *Des Moines Natl. Bank* v. *Fairweather, Mayor,* 263 U. S. 103, 106. *First Natl. Bank* v. *Anderson, County Auditor,* 269 U. S. 341, 347. *First Natl. Bank* v. *Hartford,* 273 U. S. 548, 550–551. *Iowa-Des Moines Natl. Bank* v. *Bennett,* 284 U. S. 239, 244. *Colorado Natl. Bank* v. *Bedford,* 310 U. S. 41, 50–51. See *Michigan Natl. Bank* v. *Michigan,* 365 U. S. 467, 470; *Department of Employment* v. *United States,* 385 U. S. 355, 360. The soundness of this construction of § 548 has been questioned. Note, Schweppe, State Taxation of National Bank Stocks: Uncertainty of its Constitutional Basis, 6 Minn. L. Rev. 219. Traynor, National Bank Taxation in California, 17 Cal. L. Rev. 83, 84–94. The principle that § 548 stands as the outer limit of State power to tax national banks, first advanced in *Owensboro Natl. Bank* v. *Owensboro,* 173 U. S. 664, necessarily depends on the underlying premise that absent such a statute the Constitution of the United States would prohibit a tax levied upon a national bank. Only if that preliminary conclusion is made can § 548, which only purports to regulate taxation of national bank shares, be interpreted to forbid the States

from imposing other taxes on national banks. As already pointed out, we do not believe that this underlying premise, that the Constitution confers immunity on national banks, remains valid when judged in the light of recent decisions of the Supreme Court of the United States.

From the recent trend of Supreme Court decisions restricting severely the doctrine of implied constitutional immunity has emerged a countervailing principle. In these decisions the Supreme Court, while curtailing immunity as a matter of constitutional law, has indicated that Congress, if it desires, may confer immunity by statute. *United States* v. *Detroit,* 355 U. S. 466, 474, 475. Congress "has under the Constitution exclusive authority to determine whether and to what extent its instrumentalities . . . shall be immune from state taxation." *Maricopa County* v. *Valley Natl. Bank,* 318 U. S. 357, 361. *James, State Tax Commr.* v. *Dravo Contr. Co.* 302 U. S. 134, 160–161. *Pittman, Clerk of the Superior Court of Baltimore* v. *Home Owners' Loan Corp.* 308 U. S. 21, 32–33. *Oklahoma Tax Commn.* v. *United States,* 319 U. S. 598, 606–607. See, e.g., *Federal Land Bank* v. *Bismarck Lumber Co.* 314 U. S. 95; *Carson* v. *Roane-Anderson Co.* 342 U. S. 232; *Federal Land Bank* v. *Board of County Commrs. of Kiowa County, Kansas,* 368 U. S. 146.

Such immunity, however, must be expressly conferred. The Supreme Court of the United States has repeatedly said that tax exemptions are not granted by implication. *United States Trust Co.* v. *Helvering, Commr. of Int. Rev.* 307 U. S. 57, 60. *Oklahoma Tax Commn.* v. *United States,* 319 U. S. 598, 606. This rule has been rigidly applied in the area of intergovernmental immunity. Congress has not created an immunity here by affirmative action, and "[t]he immunity formerly said to rest on constitutional implication cannot now be resurrected in the form of statutory implication. *Oklahoma Tax Commn.* v. *United States,* 319 U. S. 598, 604." *Oklahoma Tax Commn.* v. *Texas Co.* 336 U. S. 342, 366. "Silence of Congress implies immunity no more than does the silence of the Constitution. . . .

[I]f it appears that there is no ground for implying a constitutional immunity, there is equally a want of any ground for assuming any purpose on the part of Congress to create an immunity." *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, 480.

Any construction of § 548 which would prohibit the imposition of a use tax upon a national bank must rest on implication since the section, by its terms, does not purport to prohibit any taxation. Such an implied prohibition would be in marked contrast with numerous other statutory tax exemptions created by Congress.[23] The thrust of the recent decisions of the Supreme Court on intergovernmental tax immunity indicates that a statute like § 548 is not to be interpreted in a manner inconsistent with its express terms. For these reasons the application of the use tax to purchases made by the plaintiff does not violate any law of the United States.

## V.   CONCLUSION.

We are of the opinion that the plaintiff is not exempted from the taxes imposed by §§ 1 and 2 of the Act by virtue of subsections 6 (a) or 6 (d) of § 1, or of subsection 5 (b) of § 2. An interlocutory decree is to be entered overruling the demurrer. A final decree is to be entered declaring that emergency regulation No. 6 is valid in so far as it rules that purchases of tangible personal property by national banks are subject to the Massachusetts sales and use taxes.

*So ordered.*

CUTTER, J. (concurring) The later part of the opinion of the court takes the position, with which I agree, that the Constitution of the United States and 12 U. S. C. § 548

---

[23] See, e.g., 12 U. S. C. § 531 (1964) (Federal reserve banks); 12 U. S. C. § 931 (1964) (Federal land banks); 12 U. S. C. § 931 (1964) (Federal land bank associations); 12 U. S. C. § 1433 (1964) (Federal home loan banks); 12 U. S. C. § 1464 (h) (1964) (Federal savings and loan associations); 12 U. S. C. § 1723 (c) ·(1964) (Federal National Mortgage Association); 12 U. S. C. § 1768 (1964) (Federal credit unions); 12 U. S. C. § 1825 (1964) (Federal Deposit Insurance Corporation).

(1964) do not prevent the imposition of a nondiscriminatory State use tax with respect to a situation or transaction in which a national bank has become the purchaser and user of tangible personal property. Similar considerations seem to me to permit the imposition of a nondiscriminatory State sales tax with respect to a transaction in which a national bank is the purchaser of tangible personal property. I concur in the result of the opinion of the court on this ground which seems to me to be implicit in what the opinion of the court says about the use tax. In my view, there is no occasion to decide whether the legal incidence of the Massachusetts sales tax is upon such a national bank as a retail purchaser or upon its vendor.