ZAYRE LEASING CORPORATION vs. STATE TAX COMMISSION.

Suffolk.   March 6, 1974. — May 24, 1974.

Present: REARDON, QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Taxation,* Sales tax, Exemption, Lease. *Words:* "Sale."

Under the definition of "Sale" as including any "lease" of tangible personal property in St. 1966, c. 14, a statute effective March 2, 1966, and applying to sales at retail commencing April 1, 1966, and under the provision of St. 1966, c. 14, § 3, that certain written agreements "entered into before the effective date" of the statute "shall be exempt from the tax," written leases of furniture, fixtures and other equipment entered into prior to March 2, 1966, but with terms and monthly payments of rent extending after April 1, 1966, were within the exemption, and rents paid and payable after that date were exempt from the tax. [351-357]

APPEAL from a decision by the Appellate Tax Board.

*Nathan T. Wolk* for the taxpayer.

*Robert H. Quinn,* Attorney General, *Walter H. Mayo, III,* Assistant Attorney General, *& Joseph A. Grasso, Jr.,* Deputy Assistant Attorney General, for the State Tax Commission, submitted a brief.

KAPLAN, J.   The temporary emergency sales tax statute of 1966 (St. 1966, c. 14) laid a tax on the sale at retail of tangible personal property, and provided in effect that leases were to be assimilated to sales for purposes of the tax. Raised by the present appeal is the question whether certain leases entered into prior to March 2, 1966, the effective date of the statute, and pursuant to which possession was transferred prior to that date, but with terms extending after April 1, 1966, the commencement of the taxable period, fell under the statute, so that tax was owing on the rents payable and paid after April 1, 1966.

To be more precise: The appellant Zayre Leasing Corporation, which was engaged in the business of leasing furniture, fixtures, and other equipment to Zayre department stores, entered into eighteen lease agreements with such stores, all prior to 1966. The leases were all in the same form, differing, however, as to length of term, name of lessee, property leased, and rental amounts. Rent was expressed in each case as a flat yearly amount, payable in equal monthly instalments in advance.[1] The leases were stated to be "non-terminable," but with the lessor retaining the right to terminate for nonpayment of any instalment of rent (and in a few other events[2]); the lessee could terminate only by payment of the rent for the full term of the lease and surrender of the leased property, title to which was in all events reserved to the lessor.[3]

The Commissioner of Corporations and Taxation assessed sales tax deficiencies against the appellant[4] covering the monthly rents paid under these leases during the thirteen month period from April, 1966, through April, 1967.[5] The appellant paid the deficiencies assessed and

---

[1] In addition, the lessee undertook to pay taxes that might be assessed on the property and to keep up insurance.

[2] The contingencies included insolvency or commission of an act of bankruptcy on the part of the lessee.

[3] The specimen lease set out in the record, commencing on June 1, 1962, and running for seven years to May 31, 1969, provided that, if not in default, the lessee by giving notice on or before November 30, 1968, could exercise an option to extend the term of the lease for an additional period of five years on the same conditions. It does not appear from the record that any of the other leases at bar were in a renewal period that commenced after March 2, 1966 — which might have raised a special problem of interpretation in respect to the tax.

[4] As to the vendor's (lessor's) responsibility for payment of the tax, see *First Agricultural Natl. Bank* v. *State Tax Commn.* 353 Mass. 172, 178-181 (1967), revd. 392 U. S. 339 (1968) (also commenting on the theory of the tax), and *Supreme Council of the Royal Arcanum* v. *State Tax Commn.* 358 Mass. 111, 112-113 (1970).

[5] The temporary statute was declared in force on March 2, 1966, and under § 79 applied to sales during the period April 1, 1966, to December 31, 1967. (But as to the time interval, compare § 3, quoted below in the text.) Permanent legislation came in with St. 1967, c. 757, § 1, inserting a chapter 64H in the General Laws, but by c. 757, § 4, the temporary statute continued to apply to sales in the specified period.

petitioned for abatement on the ground that the statute did not extend to these leases. The Appellate Tax Board held against the taxpayer, and the case is here on the taxpayer's appeal, the basic facts having been incorporated in a statement of agreed facts.

The tax was "[a]n excise . . . upon sales at retail of tangible personal property," see § 1, subsection 2, and in another sense, an excise on the privilege of selling at retail, see § 1, subsection 7 (a), with sale defined as including lease or rental or the transfer of possession. Section 1, subsection 1 (12) (a).[6] The tax was not on the receipt of the price or rental paid; the payments were rather a measure of the amount of tax that was owed.

Few cases throw light on the question of the applicability of such a tax to a lease executed before the relevant statute went into force but extending thereafter. There is a natural temptation to engage in discussion of an abstract question inherently insoluble, namely, whether the lease or transfer of possession should be viewed as a single transaction or as a multiple transaction, or, otherwise stated, whether the possession is to be regarded as transferred in solido at the start, or piece by piece as agreed instalments of rent become due. In *Broadacre Dairies, Inc.* v. *Evans*, 193 Tenn. 441 (1952), the multiple view was taken, and the tax held correctly assessed on the rentals becoming due after the effective date of the statute. The same result was reached in *Gandy* v. *Washington*, 57 Wash. 2d 690 (1961) (a six to three decision). See also *Canton Co. of Baltimore* v. *Comptroller of the Treasury*, 231 Md. 294, 297-298 (1963), app. dism. 375 U. S. 58 (1963). A recent Minnesota case, *Hansord Agency, Inc.* v. *Commissioner of Taxn.* 294 Minn. 198 (1972), has avoided generalities and looked more closely at the nature of the particular transaction. The court had before it long-term, nonterminable leases of

---

[6] The text of the definition is quoted at n. 8 below. The assimilation of leases to sales was no doubt actuated at least in part by a legislative purpose to forestall evasion of the tax by taxpayers masking sales as leases, just as the simultaneous adoption of a use tax was to prevent evasion of the sales tax through transactions technically consummated outside the Commonwealth. Compare n. 7 below.

motor vehicles at flat rentals payable in monthly in-
stalments. The lessor-taxpayer was held free of the tax that
had been assessed on instalments payable after the statute
took effect. Distinguishing the *Broadacre Dairies* case, the
court pointed to the fact that the lease in question there,
which was of a sealing machine for milk containers, had a
special periodicity because it was terminable by the lessee
on thirty days' notice and the rentals were not flat and fixed
but were determined in part by the number of units
processed through the machine. Cf. *Dayton Rubber Mfg.
Co.* v. *Glander*, 149 Ohio St. 67 (1948). As to the *Gandy*
case, *supra*, the Minnesota court joined with the dissenters
there in thinking that the majority had erroneously fas-
tened on the payments of the rent, rather than on the
leasing, as the crux of the tax.

Although attracted by the Minnesota decision as an
approach to the facts of the present appeal, we need not
carry that analysis to the end, for, with some apparent
awareness of the problem, our Legislature made the follow-
ing quite specific provision in § 3 of the temporary law:
"Agreements for the sale of goods subject to the tax
imposed by section one . . . entered into before the effective
date of this section [March 2, 1966] shall be exempt from
the tax imposed by said section; provided, that such
agreements are in writing, signed by the vendor and
purchaser, and impose an unconditional liability on the
part of the purchaser to buy the goods covered thereby at a
fixed price without escalator clause, and an unconditional
liability on the part of the vendor to deliver a definite
quantity of such goods at the contract price; and provided,
further, that delivery is made not later than June thirtieth,
nineteen hundred and sixty-six."[7] As "sale" is defined to
include "lease,"[8] and this like the other statutory defini-

---

[7] That one purpose, at least, of this provision was to insure that the exempted
transactions were firm and bona fide, compare the statutory text involved in *John
McShain, Inc.* v. *District of Columbia,* 205 F. 2d 882, 884 (D. C. Cir. 1953), cert.
den. 346 U. S. 900 (1953).

[8] " 'Sale' and 'selling' include: — (a) Any transfer of title or possession, or both,
exchange, barter, lease, rental, conditional or otherwise, of tangible personal

tions is to control "except where the context clearly indicates a different meaning,"[9] it appears on a superficial reading that the tax was here erroneously assessed on an exempted transaction.[10] The appellee State Tax Commission argues that exemptions are to be strictly construed, and it also points to its Emergency Regulation No. 3, promulgated on April 28, 1966, providing in part as follows: "2. Each period for which a rental is paid shall be considered a complete sale for the purpose of the imposition, collection and payment of the sales or use tax.[11] . . . 4. The sales or use tax shall apply to all charges for the rental or lease of tangible personal property with respect to periods beginning on and after April 1, 1966, for which a rental is paid, even though the rental agreement or contract was entered into prior to April 1, 1966 and transfer of possession to the lessee was made prior to that date."[12] But, despite the fact that § 3 of the temporary law is exemptive in character, we do not think there was anything in its context to avoid the definition of "sale" as including "lease." Thus,

---

property for a consideration, in any manner or by any means whatsoever." § 1, subsection 1 (12) (a).

[9] *"Definitions.* — When used in this section the following words, terms and phrases shall have the following meaning except where the context clearly indicates a different meaning: —. . . ." § 1, subsection 1 (introductory words).

[10] The statement of agreed facts, evidently with a view to the requirements of § 3, quoted in the text, includes the following: "Each of said eighteen leases (i) were in writing, (ii) were signed by the vendor (lessor) and purchaser (lessee), (iii) imposed an unconditional liability on the part of the vendor [*sic*] (lessee) to lease the goods covered thereby at a fixed price without escalator clause, (iv) imposed an unconditional liability on the part of the vendor (lessor) to deliver a definite quantity of such goods at the contract price, and (v) delivery of said goods was made prior to 1966."

[11] This provision may have served the administrative need of making it clear that the usual provision in a lease for payment of instalments of rent in advance was not to be taken as an arrangement to extend credit to the lessee. (In ordinary acceptation it is surely not so understood.) Otherwise the sales tax would be payable immediately on the total amount of the rent, for by § 1, subsection 1 (14) (b) (ii), "sales price" included "any amount for which credit is given to the purchaser by the vendor," and the rate of the excise was three percent of the "gross receipts" ( § 1, subsection 2) which was in turn defined as "the total sales price received by vendors, as a consideration for retail sales" ( § 1, subsection 1 [6]). See Dane, The New Sales and Use Tax Law, 51 Mass. L. Q. 239, 270 (1966).

[12] The full text of the regulation can be found in Barrett and Bailey, Taxation (2d ed.) App., pp. 518-519 (1970).

the regulation, in attempting to limit § 3 by drawing a line between true sales on the one hand, and leases as assimilated sales, on the other hand, fails at least on the present facts because it is inconsistent with the statute.[13] The appellee State Tax Commission has pressed the argument that application of the regulation here would promote "equality" of taxation, but this would ignore a distinction between past and future transactions in a given category that the Legislature chose to enact.[14]

A case in Florida bears resemblance to the present. The Florida statute defined "sale" to include lease, as our statute did, and had substantially the same admonition about the governing effect of a statutory definition except where the context clearly indicated a different meaning. Exempted from the tax were "occasional and isolated sales or transactions." The "occasionals" in question were leases. An administrative regulation stated that "[t]he rental of tangible personal property cannot qualify for exemption as an occasional or isolated sale." There, as here, the tax authorities argued that the statutory definition assimilating leases to sales should not apply to an exemptive provision of the law; but the court, giving effect to the definition of "sale," held the regulation to be inconsistent with the statute and the taxpayer entitled to exemption. *Richard Bertram & Co.* v. *Green*, 132 So. 2d 24 (Fla. Dist. Ct. of App. 1961), cert. den. 135 So. 2d 743 (Fla.

---

[13] The State Tax Commission was vested with the power to issue emergency regulations "not inconsistent with this section."

The legality of the regulation so far as it purported to deny exemption to leases antedating the statute, was questioned in an important early commentary on the temporary act. See Dane, The New Sales and Use Tax Law, 51 Mass. L. Q. 239, 270, 280 (1966).

[14] The terms of § 3 being precise, we need not assess the weight of the appellant's further argument that its leases were exempt from tax under § 79, providing in part that "Sections one to four, inclusive, shall take effect upon the passage of this act and shall apply to sales at retail of tangible personal property during the period commencing April first, nineteen hundred and sixty-six, and ending December thirty-first, nineteen hundred and sixty-seven, and to the storage, use or other consumption of tangible personal property purchased from any vendor during said period."

1961), app. dism. 136 So. 2d 343 (Fla. 1961).[15] We follow the same line of interpretation.

The decision of the Appellate Tax Board is reversed. The case is remanded to the board. An abatement is to be granted in accordance with this opinion.

*So ordered.*

---

[15] In a later case, *Ryder Truck Rental, Inc.* v. *Bryant*, 170 So. 2d 822, 826 (Fla. 1964), the court pointed to the words "or transactions" following "sales" in the exemptive provision as indicating an intention to use "sales" with an inclusive meaning.