481 F.2d 963
 UNITED STATES of America et al., Plaintiffs-Appellees,
v.
STATE TAX COMMISSION et al., Defendants-Appellants.
UNITED STATES of America et al., Plaintiffs-Appellees,
v.
STATE TAX COMMISSION et al., Defendants-Appellees.
First Federal Savings and Loan Association of Boston et al.,
Intervenors-Appellants.
 Nos. 72-1380, 72-1381.
 United States Court of Appeals,
First Circuit.
 Argued March 8, 1973.
Decided June 28, 1973.
 
 Terence P. O'Malley, Asst. Atty. Gen., with whom Robert H. Quinn, Atty. Gen., and Walter H. Mayo III, Asst. Atty. Gen., were on briefs, for the State Tax Commission.
 Daniel B. Bickford, Chester M. Howe, and Richard McCarthy, Boston, Mass., with whom Ely, Bartlett, Brown & Proctor, and Joseph W. Bartlett, Boston, Mass., were on briefs, for First Federal Savings and Loan Assn. of Boston, and others.
 Charles E. Stratton, Atty., Tax Div., Dept. of Justice, with whom Fred B. Ugast, Acting Asst. Atty. Gen., with whom James N. Gabriel, U. S. Atty., Meyer Rothwacks, and Bennet N. Hollander, Attys., Tax Div., Dept. of Justice, were on brief, for United States.
 Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.
 LEVIN H. CAMPBELL, Circuit Judge.
 
 
 1
 These appeals question the validity of Massachusetts taxes[1] on the deposits and income of federal savings and loan associations (hereinafter "federal associations").
 
 
 2
 In No. 72-1380, the United States seeks a declaration that the deposits tax, Sec. 11(a)(2)(ii) and (b)(2)(ii), violates Sec. 5(h) of the Home Owners' Loan Act of 1933, 12 U.S.C. Sec. 1464(h).[2] The United States objects to the deduction for loans secured by mortage of out-of-state real estate "within a radius of fifty miles of the main office" of a particular bank. M.G.L. c. 63 Sec. 11(a)(2)(ii) and (b)(2)(ii). It contends that the 50-mile limitation causes a "greater" tax upon the federal associations than upon other similar state-chartered banks in violation of Sec. 5(h) because the federal associations, unlike state banks, are empowered by controlling federal law to make out-of-state loans on real estate beyond a 50-mile radius and hence get no deduction for loans beyond that limit. We agree with the district court that the challenged deduction results in an illegal disparity of tax treatment between federal and local banks.
 
 
 3
 In No. 72-1381, six federal associations challenge the income tax, Sec. 11(a)(1) and (b)(1) on grounds that it violates Sec. 5(h) and various state and federal constitutional provisions. The United States has not joined in this challenge. We conclude, under equitable principles which federal courts normally apply to tax litigants other than the United States, that declaratory relief should have been denied without consideration of the merits.
 
 I. No. 72-1380 (the Deposits Tax)
 
 4
 The United States, on behalf of the Federal Home Loan Bank Board, brought a complaint seeking a declaration that Sec. 11(a)(2)(ii) and (b)(2)(ii) (the deposits tax) contravenes Sec. 5(h) and the Supremacy Clause of the federal Constitution.[3] Six federal associations were permitted to intervene and joined in the attack on the deposits tax, contending also that the deposits tax violates the Commerce Clause. They raised other issues, which are the subject of the appeal in No. 72-1381.
 
 
 5
 On plaintiffs' motions for summary judgment, the district court ruled that the deposits tax violates Sec. 5(h) and the Supremacy Clause because it
 
 
 6
 operates in a very real way to bring intense economic pressure to bear on federally chartered banks which it does not bring to bear in any meaningful way on state chartered banks because of the fact that other state legislation severely restricts state chartered banks from making any substantial amount of loans in non-exempt areas.
 
 
 7
 The court also ruled that the deposits tax interferes with the federal associations' ability to carry out congressional purpose and policies in the lending of money, and that it constitutes "an unreasonable burden on the circulation of loans for home improvements in interstate commerce." United States v. State Tax Comm'n, 348 F.Supp. 397, 400 (D. Mass.1972). It rendered an amended judgment declaring invalid Sec. 11(a)(2) and (b)(2). The Commonwealth has appealed.
 
 
 8
 M.G.L. c. 63, Sec. 11(a)(2)(ii) and (b) (2)(ii), as inserted by St.1966, c. 14, Sec. 11 and amended by St.1971, c. 555, Sec. 26, is the latest in a series of taxes on the deposits of Massachusetts savings institutions going back to St.1862, c. 224, Sec. 4. The original deposits tax, which before 1966 was imposed solely on non-federal institutions, was litigated extensively in the 1860's; both the Massachusetts Supreme Judicial Court and the Supreme Court sustained its validity,[4] the latter having stated that a deposits tax was,
 
 
 9
 better calculated to effect justice among the corporations required to contribute to the public burdens than any other which has been devised, as its tendency is to graduate the required contributions to the value of the privilege granted.
 
 
 10
 Society for Savings v. Coite, 6 Wall. 594, 608, 18 L.Ed. 897 (1867). A deduction for loans secured by mortgage of Massachusetts real estate taxable in the Commonwealth was enacted in 1881. St. 1881, c. 304, Sec. 8. Its purpose was to avoid double taxation, Massachusetts property owners being subject to local real estate taxes at full, fair cash value. Lexington Savings Bank v. Commonwealth, 252 Mass. 180, 182, 147 N.E. 569, 570 (1925). See M.G.L. c. 59, Sec. 38; Bennett v. Board of Assessors of Whitman, 354 Mass. 239, 240, 237 N.E.2d 7, 9 (1968).
 
 
 11
 In 1966 Massachusetts adopted substantially the present statute, extending the deposits tax to federal associations. For the first time, the deduction for loans upon Massachusetts real estate was supplemented by a deduction for loans within a 50-mile radius on real estate in contiguous states. It is that feature which the federal associations attack as resulting in a "greater" tax upon them.[5] The statute provides for a tax of one-twentieth of one percent upon average deposits and share capital after deducting (i) the bank's real estate used for banking purposes; (ii) the unpaid balances on loans secured by "mortgage of real estate taxable in this commonwealth, or . . . in a state contiguous . . . within a radius of fifty miles of the main office of such bank or association." The deduction is further qualified by a "grandfather clause" deduction allowing a bank or association not previously subject to tax to deduct the unpaid balance on loans secured by real estate outside Massachusetts which were outstanding at the time the tax statute was enacted in 1966.
 
 
 12
 The federal associations are federally created banks. Cf. First Agricultural National Bank of Berkshire County v. State Tax Commission, 392 U.S. 339, 340, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1968). Chartered and regulated by the Federal Home Loan Board under authority conferred in the Federal Home Owners' Loan Act, 12 U.S.C. Sec. 1464, they serve the statutory purpose of providing "local mutual thrift institutions in which people may invest their funds and . . . for the financing of homes." Sec. 1464(a). The latter purpose, described more broadly as the "preservation of home owners and the promotion of a sound system of home mortgage," has been said to affect the welfare of the nation as a whole. First Federal Savings and Loan Association v. Loomis, 97 F.2d 831, 840 (7th Cir. 1938), cert. granted, 305 U.S. 564, 59 S.Ct. 92, 83 L. Ed. 355 (1938); dismissed on motion of counsel for petitioners sub nom. Martin v. First Federal Savings & Loan Ass'n, 305 U.S. 666, 59 S.Ct. 363, 83 L.Ed. 432 (1938). See Fahey v. O'Melveny, 200 F.2d 420 (9th Cir. 1952), cert. denied sub nom. Willhoit v. Fahey et al., 345 U.S. 952, 73 S.Ct. 866, 97 L.Ed. 1374 (1953).
 
 
 13
 The federal associations are closely affiliated with their district federal home loan bank (there are twelve nationally), which may provide them credit. The chairman of the Home Loan Bank Board states in an affidavit that the 4500 savings and loan associations in the nation are "the major mortgage lenders on residential properties," playing "the key role in the housing market" and providing "the largest, most stable source of funds for housing." They hold "44% of all outstanding home mortgages" and serve to promote the national housing policy "to provide for the economical financing of home ownership . . . by facilitating to the extent possible the inter-regional flow of mortgage funds from capital surplus areas to nationwide housing markets located in capital shortage areas."
 
 
 14
 The federal associations are allowed to "lend their funds only on the security of their savings accounts or on the security of first liens upon real property within one hundred miles of their home office or within the State in which such home office is located. . . ." Sec. 5(c). The area limit was so extended from 50 to 100 miles by the Housing Act of 1964, Title IX, Pub.L. 88-560, Sec. 901(a), 78 Stat. 804. The accompanying House Committee report stated:
 
 
 15
 The present 50-mile limitation was placed in the statute more than 25 years ago. In the intervening years, the country has experienced a tremendous suburban expansion, the establishment of new road systems and mass transit so that the commuting distance and metropolitan areas have been constantly enlarged. In recognition of these changes, your committee feels that the statutory lending area . . . should be 100 miles. . . .
 
 
 16
 1964 U.S.Code Cong. and Adm.News, p. 3442. The federal associations are also allowed to make certain investments outside the prescribed geographical areas. See, e.g. Sec. 5(h), 12 C.F.R. Sec. 545.6-4.
 
 
 17
 The "similar local" Massachusetts institutions purportedly favored by the area limitation in the deduction provisions of M.G.L. c. 63, Sec. 11 are the savings banks (c. 168), the co-operative banks (c. 170), the savings and loan associations (c. 93, Sec. 34) and the credit unions (c. 171). Excepting the credit unions, the similarity of which is disputed, all are conceded to be "similar" to the federal associations. See Comm'r of Corporations and Taxation v. Flaherty, 306 Mass. 461, 28 N.E.2d 433 (1940) (co-operative banks similar).
 
 
 18
 Massachusetts banks are restricted to real estate loans within the state, and within states contiguous to Massachusetts if such loans are not more than 50 miles from the home office in the case of savings banks, and 25 in that of cooperatives.[6] Section 34 of M.G.L. c. 93 gives the commissioner of banks the same powers and duties over savings and loan associations as he has over savings banks; the district court inferred from this section that the same restrictions on lending area apply to both kinds of banks. The banks may loan upon security outside the restricted area if the loans are VA or FHA-insured. M.G.L. c. 168 Sec. 35(11); c. 170 Sec. 24A.
 
 
 19
 The district court found, and we concur, that the area limitation in the deduction provision of the deposits tax results in a violation of Sec. 5(h). It also found a violation of the Supremacy Clause, and appellees further claim a violation of the Commerce Clause. We prefer, however, to rest our decision upon the statutory rather than the constitutional grounds.
 
 
 20
 It is true that the federal associations, being federal instrumentalities, are immune from state taxation by virtue of the Supremacy Clause, absent specific Congressional authorization. McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579 (1819); Agricultural Bank v. Tax Comm'n, supra, 392 U.S. 339, 88 S. Ct. 2173, 20 L.Ed.2d 1138. See Helvering v. Gerhardt, 304 U.S. 405, 411, 58 S.Ct. 649, 82 L.Ed. 1091 (1938). However, since Sec. 5(h) permits states to tax federal associations, the question is not whether Massachusetts may tax but whether its tax conforms to the statute. Obviously, Sec. 5(h) is to be read in light of the purposes of the Home Owners' Loan Act, and with awareness of the objects of the Supremacy and Commerce Clauses; but we see the latter as providing more a frame of reference than as separate grounds for decision.
 
 
 21
 The Supreme Court has said that Sec. 5(h) "unequivocally bars discriminatory state taxation of the Federal Savings and Loan Associations." Laurens Federal Savings & Loan Ass'n v. South Carolina Tax Commission, et al., 365 U.S. 517, 523, 81 S.Ct. 719, 722, 5 L.Ed.2d 749 (1961). Otherwise the Court has not had occasion to interpret the clause. However, the Court has said that a similar clause, 12 U.S.C. Sec. 548, permitting state taxation of national banks,[7] is meant "'to prohibit only those systems of state taxation which discriminate in practical operation against national banking associations or their shareholders as a class."' Michigan Nat'l Bank v. Michigan, 365 U.S. 467, 473, 81 S.Ct. 659, 662, 5 L.Ed.2d 710 (1961), quoting Tradesmens Nat'l Bank v. Oklahoma Tax Comm'n, 309 U.S. 560, 567, 60 S.Ct. 688, 84 L.Ed. 947 (1940). In Michigan the Court also said that the states may not "create 'an unequal and unfriendly competition' with national banks," and that "we are taught that in determining the burden of the tax-its discriminatory character-we look to its effect, not its rate." 365 U.S. at 473, 475, 81 S.Ct. at 662, 663.
 
 
 22
 Figures stipulated in the district court show that the 50-mile deduction limit discriminates in "practical operation" and in "effect" against the federal associations. We are not persuaded by Massachusetts' contrary marshalling of the figures. Massachusetts relies on the fact that from 1966-70 the total real estate loan deductions available to federal associations actually comprised a greater percentage of deposits than did deductions available to local institutions. But these figures do not separate out the impact of the "grandfather clause" deductions which are, of course, of diminishing and temporary benefit to the federal associations. (The latter characteristics are reflected in figures showing that the percentage of federal associations' deposits not offset by a deduction has risen from 8.7% to 28.6% since 1966.) After allowance is made for the grandfather clause component, the percentage of deductions to deposits is significantly lower for the federal associations than for the local banks. The federal associations make about 44% of their loans on security of real property outside the 50-mile area. The local institutions make only about 15% of the loans on outside property.[8] We conclude that but for the grandfather clause, the federal associations would have received a substantially lesser deduction against deposits in the 1966-70 period and would have paid a greater tax.
 
 
 23
 It can be argued that the federal banks are not required to loan on real estate beyond 50 miles. But this argument conflicts with the purposes of the Home Owners' Loan Act as interpreted in light of the Supremacy and Commerce Clauses. The federal associations and their conferred powers are part of a Congressional scheme, national in scope, to provide a greater supply and flow of funds for home financing. The associations' authority to lend on real estate within a 100-mile area is part of this distinctively federal answer to a national problem. The Congressional aim may not be stultified by state taxation penalizing federal associations at precisely the point they exercise the greater flexibility conferred by their federal franchise. While the local banks may think it fair to obtain relief from competition in areas foreclosed to them, the housing public is entitled to receive the untrammeled benefit of the wider powers. If the federal associations can achieve tax equality only by restricting their lending areas, the tax is discriminatory.
 
 
 24
 Moreover, the history of the Massachusetts tax statute suggests that the area limitation was designed to create "an unequal and unfriendly" competition. We perceive no reason-other than the impermissible one of sheltering local institutions-for adoption in 1966 of the 50-mile contiguous-state area limitation. It was then apparent that federal associations could loan more widely; indeed the grandfather clause reflected full awareness of the fact. Federal associations are entitled not to be singled out for special tax burdens; and it makes no difference whether the latter are expressly written into the statute or are tailored, as here, more subtly.[9]
 
 
 25
 We hold that Sec. 11(a)(2)(ii) and (b)(2)(ii) create a discriminatory deduction which results, within the meaning of Sec. 5(h), in a "greater" tax upon the federal associations than upon "other similar" local institutions. We do not attempt to resolve the further argument, raised by the intervenors and rejected by the district court, that the tax also violates Sec. 5(h) because not imposed upon credit unions, said to be "other similar" local institutions. The district court ruled that a credit union was not such a ". . . similar local mutual or cooperative thrift and home financing institution" within Sec. 5(h). See Manchester Federal Savings and Loan Ass'n v. State Tax Comm'n, 105 N.H. 17, 191 A. 2d 529 (1963); First Fed. Sav. and Loan Ass'n v. Connelly, 142 Conn. 483, 115 A.2d 455 (1955); State v. Minnesota Fed. Sav. and Loan Ass'n, 218 Minn. 229, 15 N.W.2d 568 (1944). The credit union argument is not advanced by the United States; it is raised only by the intervenor federal associations. Apart from its being unnecessary to our ruling on the deposits tax, we decline to consider it for reasons set forth below in our discussion of the income tax.
 
 
 26
 The Commonwealth argues that, if we find the deductions provision invalid, we leave the tax undisturbed and strike only the deduction. The only question before us, however, is whether the deposits tax as it applies to the federal associations is invalid. To declare invalid only the deductions portion of the tax on the federal associations would result in an even greater discrimination upon them than now occurs.
 
 
 27
 The judgment of the district court, as presently worded, appears unnecessarily broad in that it would invalidate the deposits tax on local as well as federal institutions. We remand with instructions to the district court to modify paragraph (1) of its present judgment and decree to read as follows:
 
 
 28
 "Massachusetts General Laws, Chapter 63, Section 11(a)(2) and Section 11(b)(2) are invalid and unenforceable as applied to Federal Savings and Loan Associations because said tax provisions are in conflict with and violate the provisions of Title 12, Section 1464(h), of the United States Code."
 
 II. No. 72-1381 (the Income Tax)
 
 29
 The six federal associations appeal from the district court's refusal to grant them declaratory relief against the income tax, Sec. 11(a)(1) and (b)(1). After the United States filed its complaint, seeking a declaration against the deposits tax, the associations moved to intervene. Their complaint joined in the attack on the deposits tax; but it further prayed, separately, for declaratory relief against Sec. 11(a)(1) and (b)(1) on grounds that the deduction for required additions to guaranty fund or surplus ((iii), formerly (iv), of the last paragraph) constitutes an unlawful delegation under Art. IV and XXX of the Massachusetts Constitution, and that the non-includability of interest on deposits in the deduction for "operating expenses" ((i) of last paragraph) is an unconstitutional burden on interstate commerce in violation of the Commerce Clause.
 
 
 30
 The Attorney General of Massachusetts opposed the motion to intervene, contending, among other matters, that the federal associations were barred by the Tax Injunction Act (commonly referred to as the Johnson Act),[10] 28 U.S. C. Sec. 1341, from relief in the federal court. The district court permitted intervention under F.R.C.P. 24(b). In answer to the intervenors' complaint, the Attorney General raised the affirmative defense "that the intervenors have failed to pursue the remedies available to them through the state statutory abatement procedure, suit in the state courts for declaratory relief, or other state remedy."
 
 
 31
 In its brief on motion for summary judgment, the intervenors raised two contentions not contained in the complaint: that the income tax is discriminatory in violation of Sec. 5(h), and that the entire Sec. 11 violates Sec. 5(h) because it does not cover credit unions, which the intervenors contended, are "similar . . . institutions" within the meaning of Sec. 5(h).
 
 
 32
 The district court did not rule on the state constitutional issue raised in intervenors' complaint. It abstained from ruling on the question concerning the deduction of operating expenses because of a pending proceeding before the State Tax Commission.[11] 348 F.Supp. at 401. The district court ruled that the deduction for reserve requirements does not violate Sec. 5(h) because
 
 
 33
 [t]here is nothing to preclude the Federal Home Loan Bank Board from altering the minimum guaranty requirements of federal savings and loan associations so as to provide a greater tax shelter to the Federal Savings and Loan associations than is allowed by the application of state law. 348 F. Supp. at 401.
 
 
 34
 It also ruled that credit unions are not similar institutions within the meaning of Sec. 5(h). 348 F.Supp. at 400.
 
 
 35
 Appellants raise all these issues and, in addition, new issues under state and federal constitutional law. Various considerations compel us to decline to consider the intervenors' claims. Foremost is the policy against federal declaratory relief against state taxing statutes where taxpayers have adequate recourse to state courts for a determination of their claims. Great Lakes v. Huffman, 319 U.S. 293, 300-301, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943).
 
 
 36
 In Great Lakes the Supreme Court considered the applicability of the Johnson Act, 28 U.S.C. Sec. 1341, to a suit for declaratory relief against a state tax. The taxpayers sought a declaration that the contribution to the state unemployment insurance fund required of them was unconstitutional. The district court held the tax constitutional, and was affirmed by the Court of Appeals, 43 F.Supp. 981 (E.D.La.1942), 134 F. 2d 213 (5th Cir. 1943). The Supreme Court affirmed the judgment of dismissal, "but solely on the ground that, in the appropriate exercise of the court's discretion, relief by way of a declaratory judgment should have been denied without consideration of the merits." Great Lakes v. Huffman, supra, 319 U.S. at 301-302, 63 S.Ct. at 1074.
 
 
 37
 The Supreme Court did not hold that the Johnson Act itself barred declaratory judgments. Rather, its holding rested on cases antedating enactment of the Johnson Act requiring federal courts to withhold equitable relief in suits by taxpayers challenging the validity of state taxes. The Court said:
 
 
 38
 It is in the public interest that federal courts of equity should exercise their discretionary power to grant or withhold relief so as to avoid needless obstruction of the domestic policy of the states.
 
 
 39
 "The scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts, and a proper reluctance to interfere by injunction with their fiscal operations, require that such relief should be denied in every case where the asserted federal right may be preserved without it. Whenever the question has been presented, this Court has uniformly held that the mere illegality or unconstitutionality of a state or municipal tax is not in itself a ground for equitable relief in the courts of the United States. If the remedy at law is plain, adequate, and complete, the aggrieved party is left to that remedy in the state courts, from which the cause may be brought to this Court for review if any federal question be involved." Matthews v. Rodgers, supra, 284 U.S. 525, 526 [52 S.Ct. 214 at 219, 220] 76 L.Ed. 447.
 
 
 40
 The considerations which persuaded federal courts of equity not to grant relief against an allegedly unlawful state tax . . . are persuasive that relief by way of declaratory judgment may likewise be withheld in the sound discretion of the court. With due regard for these considerations, it is the court's duty to withhold such relief when . . . it appears that the state legislature has provided that on payment of any challenged tax to the appropriate state officer, the taxpayer may maintain a suit to recover it back. In such a suit he may assert his federal rights and secure a review of them by this Court. This affords an adequate remedy to the taxpayer, and at the same time leaves undisturbed the state's administration of its tax. 319 U.S. at 298, 300-301, 63 S.Ct. at 1073, 1074.
 
 
 41
 The Johnson Act and Great Lakes reflect much the same policy respecting state tax collections as applies to federal tax collections. See 26 U.S.C. Sec. 7421; Enochs v. Williams Packing Co., 370 U. S. 1, 6, 8, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962). In both instances, efficient tax collection requires that taxpayers not be able to withhold or cast doubt on taxes already or yet to be collected except through established channels. See Enochs v. Williams Packing Co., supra, 370 U.S. at 7, n. 6, 82 S.Ct. 1125. The policy is even stronger in dealing with state taxes, since the availability of broad declaratory or injunctive relief in federal courts would promote forum shopping, inconsistent interpretation of state laws, and confusion as to the effect of such judgment on taxes already collected.
 
 
 42
 In Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), the Supreme Court reaffirmed the validity of Great Lakes. There, the question was whether a federal court should declare a state criminal statute unconstitutional during the pendency of criminal proceedings. Again, the Court affirmed the lower court's judgment dismissing the complaint, "but solely on the ground that, in the appropriate exercise of the court's discretion, relief by way of declaratory judgment should have been denied without consideration of the merits." 401 U.S. at 73, 91 S.Ct. at 768. The Court said:
 
 
 43
 The continuing validity of the Court's holding in the Great Lakes case has been repeatedly recognized and reaffirmed by this Court. See e.g., Macauley v. Waterman S.S. Corp., 327 U.S. 540, 545, n. 4 [66 S.Ct. 712, 714] 90 L.Ed. 839 (1946); Ott v. Mississippi Barge Line, 336 U.S. 169, 175 [69 S.Ct. 432, 435] 93 L.Ed. 585 (1949); Public Serv. Comm'n v. Wycoff Co., 344 U.S. 237, 253 [73 S.Ct. 236, 245] 97 L.Ed. 291 (1952) (Douglas, J., dissenting); Allegheny County v. Mashuda Co., 360 U.S. 185, 189 [79 S.Ct. 1060, 1063] 3 L.Ed.2d 1163 (1959); Enochs v. Williams Packing Co., 370 U.S. 1, 8 [82 S.Ct. 1125, 1129] 8 L.Ed.2d 292 (1962). Although we have found no case in this Court dealing with the application of this doctrine to cases in which the relief sought affects state criminal prosecutions rather than state tax collections, we can perceive no relevant difference between the two situations with respect to the limited question whether, in cases where the criminal proceeding was begun prior to the federal civil suit, the propriety of declaratory and injunctive relief should be judged by essentially the same standards. In both situations deeply rooted and long-settled principles of equity have narrowly restricted the scope for federal intervention, and ordinarily a declaratory judgment will result in precisely the same interference with and disruption of state proceedings that the long-standing policy limiting injunctions was designed to avoid.
 
 
 44
 401 U.S. at 71-72, 91 S.Ct. at 767.
 
 
 45
 Thus, strong authority requires federal courts to withhold declaratory relief "without consideration of the merits" where taxpayers have a "plain, adequate and complete" remedy for their grievance in state courts. Such a remedy is available here. Abatement proceedings before the State Tax Commission may be initiated under M. G.L. c. 63 Sec. 51, made applicable to Sec. 11 taxpayers by Sec. 18A. From there lies appeal to the Appellate Tax Board, M. G.L. c. 63 Sec. 71, c. 58A, Secs. 7, 7A, 8, and from there appeal to the Supreme Judicial Court, M.G.L. c. 58A Sec. 13. If a decision from the Tax Commission is not forthcoming within three months of the filing of application for abatement, "it shall then be deemed to be denied and the taxpayer shall have the right at any time within three months thereafter, to take any appeal from such denial to which he may be entitled by law. . . ." M.G.L. c. 58A Sec. 6. In addition to the abatement remedy, a taxpayer may challenge a tax by a suit for declaratory relief. M.G.L. c. 231A Secs. 1, 2. See Massachusetts Ass'n of Tob. Dist. v. State Tax Comm'n, 354 Mass. 85, 88, 235 N.E.2d 557, 559 (1968); Stow v. Comm'r of Corporations & Taxation, 336 Mass. 337, 339, 145 N.E.2d 720, 721 (1957). Amounts are abated with interest. M.G.L. c. 58A Sec. 13.
 
 
 46
 We believe these procedures afford intervenors here a "plain, adequate and complete" means of resolving any issues, federal as well as state, they wish to raise.[12] Great Lakes, supra, 319 U.S. at 297, 63 S.Ct. 1070; Helmsley v. Detroit, 320 F.2d 476, 478-480 (6th Cir. 1963); Houston v. Standard Triumph Motor Co., 347 F.2d 194, 199 (5th Cir. 1965), cert. denied, 382 U.S. 974, 86 S.Ct. 539, 15 L.Ed.2d 466 (1966); American Commuters Ass'n v. Levitt, 405 F.2d 1148, 1152 (2d Cir. 1969). Cf. Hillsborough v. Cromwell, 326 U.S. 620, 624, 626, 66 S.Ct. 445, 90 L.Ed. 358 (1946).
 
 
 47
 While the Commonwealth has not urged that we refrain from deciding the Sec. 5(h) claim as it relates to the income tax, it has cited Great Lakes for more limited purposes both here and below; and its pleadings raised the question we now consider. In view of the Supreme Court's statement that it is the "duty" of federal courts to withhold declaratory relief in appropriate situations, Great Lakes, supra, 319 U.S. at 300-301, 63 S. Ct. 1070, we do not regard the Commonwealth's failure to press fully the issue here as a bar to our following the admonitions of Great Lakes and cases following.[13] We are not confronted with a case which was exhaustively tried below, where our failure to act, besides disappointing litigants, might lead to a waste of judicial resources. The factual record on the income tax claims is nonexistent and, indeed, quite unsatisfactory for decision of the delicate questions raised. We have neither evidence, agreed facts, nor lower court findings showing the tangible impact and operation of the challenged tax.
 
 
 48
 That the federal associations have been permitted to intervene in the United States' action, and that the United States' claim has been sustained, do not alter the requirement that the consideration of intervenors' claims regarding the income tax be withheld. They and the United States stand on different footing as litigants in federal courts seeking to interfere with state taxing schemes. The United States itself is not barred by the Johnson Act from obtaining relief against state taxes in the federal courts. Dept. of Employment v. United States, supra, 385 U.S. 355, 358, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966); United States v. Arlington County, 326 F.2d 929, 931 (4th Cir. 1964). See also United States v. Bureau of Revenue of the State of New Mexico, 291 F.2d 677, 679 (10th Cir. 1961); United States v. Woodworth, 170 F.2d 1019 (2d Cir. 1948); City of Springfield v. United States, 99 F.2d 860, 862 (1st Cir. 1938), cert. denied 306 U.S. 650, 59 S.Ct. 592, 83 L.Ed. 1049 (1939); United States v. Livingston, 179 F.Supp. 9, 11-12 (E.D. S.C.1959), aff'd, 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960). These cases rest in part on the proposition that, absent a strong contrary legislative purpose, the Johnson Act should not bar the United States from access to its own courts of equity, when it seeks to assert its own interest or that of its own instrumentalities. See United States v. Livingston, supra, 179 F.Supp. at 11-12; United States v. Arlington County, supra, 326 F.2d at 931, 932-933. Likewise, the equitable doctrine of Great Lakes should not deny relief to the United States when it seeks to implement federal policy.
 
 
 49
 But the intervenors can get no benefit from the presence of the United States. It did not challenge the income tax, and has not joined in the intervenors' complaint or appeal. They are in a different posture than the co-plaintiffs in Dept. of Employment v. United States and other cases cited supra, where the non-government party asserted the same claims as the United States.[14] We have found only one case where an instrumentality of the United States-an Indian tribe-suing without the aid of the United States has had its claims for relief considered, notwithstanding the Johnson Act. Agua Caliente Band of Mission Indians v. County of Riverside, 442 F.2d 1184, 1186 (9th Cir. 1971), cert. denied 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972). But that was not a case where the United States had clearly passed up the opportunity to challenge the particular state taxing scheme. Moreover, involving as it did a suit by a party having a unique place in federal law, we see no reason to extend it to all situations where an instrumentality brings a suit against a state or local taxing scheme independently of the United States. The 4500 federal associations, while entitled to wear the mantle of "federal instrumentalities", have many of the characteristics of private corporations. They are at the bottom of a three-tiered arrangement headed by the Home Loan Bank Board. It is reasonable, as a prerequisite to by-passing normal state tax collection and litigation channels, that they persuade the Attorney General of the United States, acting on behalf of the Home Loan Bank Board, to join in their claim. We conclude that under the principles of Great Lakes intervenors may not obtain declaratory relief against the income tax.
 
 
 50
 Deciding on this broad ground, we need not rest on any other grounds relating more specifically to several of the issues raised. Plainly, however, some of these claims would have to be dismissed, or not considered, even absent the Great Lakes policy discussed above. The federal and state constitutional claims raised for the first time here would not be considered by this Court. Talmanson v. United States, 386 F.2d 811, 812 (1st Cir. 1967), cert. denied 391 U.S. 907, 88 S.Ct. 1658, 20 L.Ed.2d 421 (1968); Securities & Exchange Comm'n v. Milner, 474 F.2d 163, 166 (1st Cir. 1973). The district court did not abuse its discretion in not exercising pendent jurisdiction over the state constitutional claims concerning the income tax. While federal courts have power to determine state law claims joined with federal claims where the different claims "derive from a common nucleus of operative fact", "[t]hat power need not be exercised in every case". United Mine Workers of America v. Gibbs, 383 U.S. 715, 725-726, 86 S.Ct. 1130, 1139, 16 L. Ed.2d 218 (1966). In light of the strong federal policy against interference with state taxing schemes, this was a case where "[n]eedless decisions of state law should be avoided . . . as a matter of comity." Id. at 726, 86 S.Ct. at 1139. Similarly, the district court wisely abstained from determining the federal constitutional claim concerning the operating expenses aspect of the income tax, given the existence of pending state proceedings that might have mooted the constitutional claim. See Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971).
 
 
 51
 The declaratory judgment entered by the district court on August 9, 1972, is set aside. A modified judgment is to be entered, clause (1) of which to be worded as set forth earlier in this opinion, and clause (2) of which is to be worded as follows:
 
 
 52
 (2) All additional relief sought by the intervening plaintiffs is denied without consideration of the merits.
 
 
 53
 So ordered. Costs for appellees in each case.
 
 
 
 [1]
 The taxes are imposed by M.G.L. c. 63, Sec. 11, which reads as follows:
 "Every savings bank as defined in chapter one hundred and sixty-eight, every co-operative bank as defined in chapter one hundred and seventy and every state or federal savings and loan association located in the commonwealth shall pay to the commissioner an annual excise equal to the following:
 (a) on or before the twenty-fifth day of the seventh month of the taxable year, there shall be paid (1) one-half of one per cent of a reasonable estimate of its net operating income, as hereinafter defined, for the taxable year, and (2) onetwentieth of one per cent of the average amount of its deposits or of its savings accounts and share capital for the first six months of the taxable year, after deducting from such average amounts (i) its real estate used for banking purposes, valued at cost less reasonable depreciation, and (ii) the unpaid balances on its loans secured by the mortgage of real estate taxable in this commonwealth, or real estate situated in a state contiguous to the commonwealth, and within a radius of fifty miles of the main office of such bank or association, and in the case of a bank or association not previously subject to tax by this commonwealth the unpaid balances on such of its loans secured by the mortgage of real estate located outside of this commonwealth which are outstanding on March first, nineteen hundred and sixtysix, both as of the close of such sixthmonth period; and
 (b) on or before the twenty-fifth day of the first month following the close of the taxable year, there shall be paid (1) one per cent of its net operating income, as hereinafter defined, for the taxable year, less the estimated amount previously paid with respect to such income, and (2) onetwentieth of one per cent of the average amounts of its deposits or of its savings accounts and share capital for the second six months of the taxable year, after deducting from such average amount (i) its real estate used for banking purposes, valued at cost less reasonable depreciation, and (ii) the unpaid balances on its loans secured by the mortgage of real estate taxable in this commonwealth, or real estate situated in a state contiguous to the commonwealth, and within a radius of fifty miles of the main office of such bank or association, and in the case of a bank or association not previously subject to tax by this commonwealth the unpaid balances on such of its loans secured by the mortgage of real estate located outside of this commonwealth which are outstanding on March first, nineteen hundred and sixty-six, both as of the close of the taxable year.
 For the purpose of this section, 'net operating income' shall mean gross income from all sources, without exclusion, for the taxable year, less (i) operating expenses, (ii) net losses upon assets sold, exchanged or charged off as uncollectible during the taxable year, and (iii) minimum additions during the taxable years to its guaranty fund or surplus required by law or the appropriate federal and state supervisory authorities; and 'taxable year' shall mean any fiscal or calendar year or period for which the bank is required to make a return to the federal government. Federal and state taxes paid or accrued during the taxable year shall not be deductible in computing 'net operating income'."
 
 
 [2]
 "No State, county, municipal, or local taxing authority shall impose any tax on such associations or their franchise, capital, reserves, surplus, loans, or income greater than that imposed by such authority on other similar local mutual or cooperative thrift and home financing institutions."
 
 
 [3]
 Jurisdiction was founded on 28 U.S.C. Sec. 1345. The United States has standing to sue on behalf of its instrumentalities. See United States v. Arlington County, 326 F.2d 929, 931 (4th Cir. 1964); Dept. of Employment v. United States, 385 U.S. 355, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966). It is not disputed that the Home Loan Bank Board, established by Congress as an independent agency with responsibility for the savings and loan system, 12 U.S.C. Secs. 1437, 1464, is a federal instrumentality
 
 
 [4]
 Commonwealth v. The People's Five Cents Savings Bank, 5 Allen 428 (1862); Commonwealth v. Provident Institution for Savings, 12 Allen 312 (1866). Provident Institution v. Massachusetts, 6 Wall. 611, 18 L.Ed. 907 (1867)
 
 
 [5]
 The federal associations' out-of-state real estate loan area had been increased by Congress in 1964, two years before the present Massachusetts tax statute was enacted, from 50 to 100 miles, with no requirement that the real estate be in a "contiguous" state. See infra. The local institutions, in 1966 as now, could not loan on out-of-state real estate beyond, at most, 50 miles. See infra
 
 
 [6]
 SAVINGS BANKS
 "Any such corporation may make . . . loans upon real estate secured by first mortgages." M.G.L. c. 168 Sec. 34, first para.
 "Such first mortgages shall be on real estate located in the commonwealth, or in a city or town of a state contiguous to the commonwealth, provided, that such city or town is not more than fifty miles from the town in which the main office of such corporation is located. . . ." Sec. 34(2).
 CO-OPERATIVE BANKS.
 "Any such corporation may make . . . loans of the following types, upon real estate situated in the commonwealth or situated in a state contiguous to the commonwealth and within a radius of twenty-five miles of the main office of such corporation. . . ." M.G.L. c. 170 Sec. 23.
 Formerly, Massachusetts banks could lend only within the state. See M.G.L. c. 168 Sec. 54 (Ter. ed. 1932), c. 170 Sec. 23 (Ter. ed. 1932). In the case of savings banks, the lending limit was first extended by St.1946, c. 256 Sec. 1 to contiguous-state loans within 25 miles, and then by St. 1955, c. 432 Sec. 34(2) to such loans within 50 miles. The co-operatives' limit was extended to contiguous-state loans within 25 miles by St.1950, c. 371, Sec. 23.
 
 
 [7]
 "(b) In the case of a tax on . . . shares the tax imposed shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State coming into competition with the business of national banks: . . ."
 
 
 [8]
 The deposits of local institutions are not wholly offset by deductible loans since they may invest in VA and FHA-insured real estate loans outside the 50-mile area, and may make non-real estate loans
 
 
 [9]
 If we assume the deduction on out-of-state loans was intended to avoid double taxation, thus placing Massachusetts banks on a parity with out-of-state banks in competing for out-of-state loans, the present tax imposes double taxation on home owners borrowing from the federal associations beyond the exempt areas. Again, the result points to discrimination rather than to promotion of some neutral object
 
 
 [10]
 "The district court shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."
 
 
 [11]
 A stipulation states: "There are pending before the Massachusetts State Tax Commission several applications for abatement filed by Massachusetts federal savings and loan associations raising the issue as to whether such deductions should be allowed."
 
 
 [12]
 State courts have concurrent jurisdiction with the federal courts in the enforcement of federal law, absent a vesting of exclusive jurisdiction in the federal courts. Claflin v. Houseman, 93 U.S. 130, 136, 23 L.Ed. 833 (1876); see Testa v. Katt, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947). Section 5(h) of the Home Owners' Loan Act has already been applied once by the Massachusetts Supreme Judicial Court to hold invalid a state taxing scheme. Comm'r of Corporations and Taxation v. Flaherty, supra. See also Agricultural National Bank of Berkshire County v. State Tax Comm'n, 353 Mass. 172, 229 N.E.2d 245 (1967), rev'd, 392 U.S. 339, 88 S.Ct. 2173, 20 L.Ed.2d 1138 (1968)
 
 
 [13]
 In City of Houston, supra, Chief Judge Brown writing for the majority said that "it is inconceivable that the Supreme Court intended [in Great Lakes] to allow any discretion to grant declaratory relief where adequate state remedies were available." 347 F.2d at 199. We do not, however, need to decide the question presented there, whether, despite the fact that the Great Lakes issue was not presented below, the Court of Appeals could properly vacate the judgment for taxpayers under the doctrine of that case. Here, the Attorney General did urge below that the court withhold relief on grounds that an adequate state court remedy existed
 
 
 [14]
 In United States v. Arlington County, supra, 326 F.2d at 932-933, the court said:
 Here we find that the interest of the national government in the proper implementation of its policies and programs involving the national defense is such as to vest in it the non-statutory right to maintain this action. Under these circumstances the incapacity of the individual plaintiff to maintain his action is immaterial since he may find shelter under the Government's umbrella.