The HOUSING AUTHORITY OF the CITY OF SEATTLE, and L. E. Spitzer Co., Inc., Plaintiffs–Appellees,

v.

STATE OF WASHINGTON, DEPT. OF REVENUE of the State of Washington and Charles W. Hodde, Director or Revenue, and his successors in office, Defendants–Appellants.

No. 79–4067.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 7, 1980.

Decided Oct. 3, 1980.

As Amended Oct. 9, 1980.

Michael Madden, Asst. Atty. Gen., Olympia, Wash., argued for defendants–appellants; Gregory Montgomery, Richard H. Holmquist, Asst. Attys. Gen., Olympia, Wash., on brief.

D. William Toone, Seattle, Wash., argued, for plaintiffs–appellees; Dwayne E. Copple, LeSourd, Patten, Fleming, Hartung & Emory, Seattle, Wash., on brief.

Before ANDERSON and SKOPIL, Circuit Judges, and BYRNE,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

The State of Washington appeals the order of the court below enjoining it from collecting certain sales taxes due from private contractors dealing with the Housing Authority of the City of Seattle (Authority), and ordering the refund of taxes already collected. The plaintiff Housing Authority joined with one of its contractors in challenging collection of the taxes on constitutional grounds. We reverse the order because the court lacked jurisdiction under the Johnson Act, 28 U.S.C. § 1341.

## I. BACKGROUND

The Authority is but one of several public housing agencies which have been organized across the nation pursuant to federal coaxing under portions of the Low Income Housing Act of 1937, 42 U.S.C. § 1437, et. seq. (Act). In general, the Act contemplates the creation by state and local governments of public housing agencies whose mission is the acquisition, construction, operation, and maintenance of low–cost housing for low–income tenants, aided by federal largesse and disciplined by the benign hand of federal regulation. The congressional declaration of policy which accompanied the passage of the Act reflects a philosophy of cooperation among federal and state government in pursuit of the goal of adequate low–income housing:

> "It is the policy of the United States to promote the general welfare of the Nation by employing its funds and credit, as provided in this chapter, *to assist the several States and their political subdivisions* to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income and, consistent with the objectives of this chapter, *to vest in local public housing agencies the maximum amount of responsibility in the administration of their housing programs. . . .*" (emphasis supplied)

42 U.S.C. § 1437.

Under the Act, the Secretary of Housing and Urban Development ("HUD") has various prerogatives for funding and directing local housing agency projects. Under 42 U.S.C. § 1437b, the Secretary may make loans and loan commitments to public housing agencies. Under § 1437c, the Secretary may make "annual contributions" to agencies, based upon specified need criteria. Each annual contribution contract must include certain specified provisions relating to the operation of projects, including a stipulation that the project is exempt from all real and personal property taxes levied by state or local government. § 1437d(d). The statutory authority of the Secretary is implemented in an extensive set of regulations which set mandatory guidelines for local

* The Honorable William Matthew Byrne, Jr., United States District Judge, Central District of California, sitting by designation.

housing authority operations.[1] Local housing agencies retain the discretionary authority to set tenant eligibility criteria and rental rates within the guidelines of the Act and the HUD regulations, though their discretion is severely limited. An agency may not, for example, set applicant priorities which are not authorized · by the Act. *See Fletcher v. Housing Authority of Louisville*, 491 F.2d 793 (6th Cir.), *judgment vacated*, 419 U.S. 812, 95 S.Ct. 27, 42 L.Ed.2d 39 (1974), *judgment reinstated*, 525 F.2d 532 (6th Cir. 1975). The local governing body which creates the public housing agency retains the discretion to approve any application to HUD for aid, however. 42 U.S.C. § 1437c(e)(1). In addition, the local government may reject proffered aid if it so desires. *See James v. Valtierra*, 402 U.S. 137, 140, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971); *Mahaley v. Cuyahoga Metropolitan Housing Authority*, 500 F.2d 1087 (6th Cir. 1974), *cert. denied*, 419 U.S. 1108, 95 S.Ct. 781, 42 L.Ed.2d 805 (1975).

The State of Washington has authorized each county and municipality to create a public housing authority eligible to accept aid under the Act. RCW 35.82.030. In the case of a city created authority, its jurisdiction includes the city's municipal boundaries and all areas within five miles of the boundaries. RCW 35.82.020(6). A board of five commissioners, appointed by the mayor of the municipality, oversees the operation of each authority. RCW 35.82.040. The legal status of a public housing authority in Washington is that of ". . . a public body corporate and public, exercising public and essential governmental functions, and having all the powers necessary or conve-

nient to carry out and effectuate the purposes and provisions of this chapter, . . . ." RCW 35.82.070. As required by the Low Income Housing Act, all property of an authority is exempt from local taxes. RCW 35.82.210.

The exemption of public housing authorities from local taxation potentially blocks the collection of any sales tax on building materials incorporated into authority projects. Under Washington's sales tax scheme, a tax is imposed upon every retail sale of personal property, and the burden of taxation falls upon the "consumer." In the case of materials incorporated into a construction project, the owner or lessee of the realty is defined as the "consumer." RCW 82.04.190(1)(b) and (4). The building contractor is viewed as a mere conduit of building materials to the ultimate consumer. Where a public housing authority contracts for construction or improvements, however, its statutory tax immunity would prevent the collection of sales taxes. In order to insure collection of sales tax on building materials, Washington, in 1975, redefined "consumer" to include any contractor working on projects for a public housing authority. Under RCW 82.04.190(6), "consumer" includes:

"(6) Any person engaged in the business of constructing, repairing, decorating, or improving new or existing buildings or other structures under, upon, or above real property of or for the United States, any instrumentality thereof, or a county or city housing authority created pursuant to chapter 35.82 RCW, including the installing or attaching of any article of tangible personal property therein or

---

1. The exact scope and detail of the HUD regulations cannot be delineated, and we consider it necessary to give only the flavor of the regulations. The Authority's brief offers a nice sampling of the more pertinent regulations, including provisions covering maximum rent (24 C.F.R. § 860.405), minimum rent (24 C.F.R. § 860.404), tenant selection criteria (24 C.F.R. § 860.205), informal hearings for rejected applicants (24 C.F.R. § 860.207), income formula for tenant eligibility (24 C.F.R. § 860.403(f)–(o)), percentage allocation of housing between "very low income" and "low income" families (24 C.F.R. § 860.406), the form and content of ten-

ant dwelling leases (24 C.F.R. § 866.1), lease termination procedures (24 C.F.R. § 866.4(1), and a tenant grievance procedure (24 C.F.R. § 866.50, *et seq.*). HUD's authority to promulgate certain of these regulations has been upheld despite the "local autonomy" provision of 42 U.S.C. § 1437. *See Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); *Housing Authority of City of Omaha v. United States Housing Authority*, 468 F.2d 1 (8th Cir. 1972), *cert. denied*, 410 U.S. 927, 93 S.Ct. 1360, 35 L.Ed.2d 588 (1973).

thereto, whether or not such personal property becomes a part of the realty by virtue of installation. Any such person shall be a consumer within the meaning of this subsection in respect to tangible personal property incorporated into, installed in, or attached to such building or other structure by such person."

The end result of this intricate bit of draftsmanship is that only those contractors who deal with the United States or with public housing authorities are liable for sales tax upon their building materials.

On November 3, 1977, the District Court for the Western District of Washington found that RCW 82.04.190(6) unlawfully discriminated against contractors who dealt with the United States on federal construction projects in *United States v. State of Washington*, No. C77–355V, currently on appeal before this panel. (CA No. 78–1424). On May 1, 1978, the plaintiffs in this appeal filed a complaint for declaratory judgment, injunctive relief and refund of taxes, alleging *inter alia* that plaintiff L. E. Spitzer Company, Inc., had contracted with the Authority for a renovation project at a contract price of $1,476,970.00, including sales tax, and that imposition of the tax upon Spitzer impermissibly discriminated against it as an entity contracting with an instrumentality of the United States. On December 22, 1978, ruling on plaintiffs' motion for partial summary judgment and the defendants' motion to dismiss, the district court entered an order declaring the Authority to be an instrumentality of the United States, and further declaring that RCW 82.04.-190(6) discriminated against those who dealt with the Authority. The order enjoined the State from collecting any sales tax pursuant to the statute, and ordered the repayment of all sales taxes impermissibly collected from the plaintiffs. The determination of the precise amount owed was deferred for stipulation by the parties or the appointment of a special master in the event that the parties could not agree. The State's appeal to this court followed.

**II. DISCUSSION**

Because the complaint called for an injunction against the collection of a state tax, we must consider the jurisdictional bar of the Johnson Act, 28 U.S.C. § 1341, which provides that:

"The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."

Because the Johnson Act also bars declaratory relief, *see, e. g., City of Houston v. Standard–Triumph Motor Company*, 347 F.2d 194 (5th Cir. 1965), *cert. denied*, 382 U.S. 974, 86 S.Ct. 539, 15 L.Ed.2d 466 (1966), a finding that the Act is applicable would effectively eliminate federal jurisdiction over this case.

The Authority, however, contends that it comes within judicially–created exceptions to the § 1341 bar.[2] First, it argues that it is a "federal instrumentality" which may protect itself against unconstitutional state taxation by invoking federal court jurisdiction. *See generally, Department of Employment v. United States*, 385 U.S. 355, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966). Second, the Authority argues that it is an entity in which the federal government has a "special interest," and, as such, that it may sue despite the restriction imposed by § 1341. *See Moses v. Kinnear*, 490 F.2d 21 (9th Cir. 1973). The Authority misconstrues the breadth of both these exceptions.

Briefly stated, the "federal instrumentality" doctrine holds that the United States may sue on its own behalf or on behalf of its "instrumentalities" in federal court to avoid allegedly unconstitutional state taxation. The rationale of the instrumentality exception holds that Congress cannot be presumed to have denied the

---

**2.** The Authority apparently does not dispute the State's contention that Washington courts afford a "plain, speedy and efficient remedy." The Washington tax remedy statutes contain nothing which suggests to us that the remedies contained therein are inadequate. RCW 82.32.-150, 82.32.180. *See Mandel v. Hutchinson*, 494 F.2d 364 (9th Cir. 1974).

United States access to its own courts without an explicit provision to that effect. *See Dept. of Employment v. United States*, 385 U.S. at 358, 87 S.Ct. at 466; *United States v. Livingston*, 179 F.Supp. 9, 11 (E.D.S.C. 1959). Consequently, the United States may resort to a federal court for relief where application of a state tax threatens some attribute of national sovereignty.

The United States, however, is not a party to the present suit. The record does not reflect whether the Authority requested the United States to join as plaintiff, nor whether the Justice Department was even aware of the suit. The First Circuit has established as a prerequisite to a suit by a federal instrumentality to enjoin the collection of state taxes that the United States be persuaded to join as plaintiff. *See United States v. State Tax Commission*, 481 F.2d 963 (1st Cir. 1973). We agree that such joinder is necessary before a federal instrumentality can overcome the restrictions of the Johnson Act. Like the First Circuit, we base this holding both upon the strong policy of noninterference with state taxation procedures codified by § 1341, and upon the rationale expressed in *Livingston, supra*, that the basis of the federal instrumentality doctrine is the presence of the United States as a party. In *State Tax Commission*, the court refused to allow a group of federal savings and loan associations to challenge the collection of a Massachusetts income tax where the United States had chosen to oppose only the collection of a tax on deposits. As explained in the subsequent case of *Federal Reserve Bank of Boston v. Commissioner of C. & T.*, 499 F.2d 60, 62 (1st Cir. 1974), if an alleged federal instrumentality wishes:

> "to by–pass normal state tax collection and litigation channels, . . . it should persuade the Attorney General of

the United States, acting on [its] behalf, . . . to join in its claim. . . . [I]f a sufficient threat to federal sovereignty were to arise, the Attorney General would presumably lend the umbrella of the United States, thus permitting access to the federal courts; if not . . . there [would be] no reason to by–pass and possibly subvert state tax collection procedures."

■ In *Federal Reserve Bank*, the First Circuit modified somewhat the general principle requiring joinder of the United States with the federal instrumentality. The court there allowed a suit by a federal reserve bank challenging a state tax on building materials, without joinder of the United States as a plaintiff, because it considered the banks of the federal reserve system to be "plainly and predominantly fiscal arms of the federal government." *Id.* The court cited such factors as federal creation and operation of reserve banks as depositories of money held by the United States Treasury as determinative of its conclusion that a state tax affecting a federal reserve bank called directly into question the sovereign interest of the United States. *Id.* at 63. It also considered significant the position of the federal reserve banks outside of the executive chain of command in deciding that such banks did not need to acquire the separate support of the Attorney General before asserting the same right available to the United States to contest, in federal court, an allegedly unconstitutional state exaction. *Id.* Even were this Court to agree with the First Circuit that there are certain federal instrumentalities which can sue without joinder of the United States (a question we need not reach), a public housing agency is plainly not the kind of federal instrumentality, if it is a *federal* instrumentality at all,[3] whose role and position in the

---

3. The Housing Authority is a primarily local entity whose funding and general policy are provided by the federal government. However, the national policy as expressed in § 1437, supra, p. 1308 is to "assist" the States and their political subdivisions and to "vest in local public housing agencies the maximum amount of responsibility." Given the large number of

such hybrid state/federal agencies involved in various programs, a finding that the Housing Authority is a "federal instrumentality" could have far reaching implications. Although arising under the Federal Tort Claims Act (28 U.S.C. § 2671, et seq.) and the Economic Opportunity Act of 1964 (42 U.S.C. § 2781, et seq.), we take comfort and some direction from

federal governmental structure would militate in favor of allowing suit in federal court on its own. A public housing agency is created by the state and operated primarily at the state or local level. The interests advanced by housing agencies are not exclusively federal, but are shared by all levels of government in our federalist system. We therefore hold that the federal instrumentality exception to the Johnson Act does not permit a public housing agency to maintain a suit in federal court challenging state taxation without the United States joining as a plaintiff in the suit.

■ The Authority claims, alternatively, that it may bring suit on its own without the United States joining as plaintiff under the "co–plaintiff" doctrine developed in *Moses v. Kinnear, supra,* and *Agua Caliente Band of Mission Indians v. Riverside,* 442 F.2d 1184, 1186 (9th Cir. 1971), *cert. denied,* 405 U.S. 933, 92 S.Ct. 930, 20 L.Ed.2d 809 (1972). The Authority argues that these cases establish the proposition that, where the United States could properly bring suit on behalf of an entity in which it has a "special interest," and where the entity could be joined as co–plaintiff, the entity may bring suit on its own behalf without the assistance of the federal government.

We do not believe that either *Moses* or *Agua Caliente Band* can be read so broadly as to permit the district court to take jurisdiction in this type of case. In both cases, the plaintiffs were Indian tribes or their representatives. At issue in *Agua Caliente Band* was the propriety of a state possessory interest tax on lands held by a tribe as lessees of the government, while *Moses* considered imposition of an excise tax upon the sale possession, and use of cigarettes at the Puyallup Reservation. In both cases, joinder of the government was deemed unnecessary. In *Agua Caliente Band,* the court reasoned that the tribe, as the beneficial owner of lands held in trust for it by the United States, had a right to sue acting

independently of the government. In *Moses,* the court found that the "special interest" which the United States has in its ward Indians compelled the conclusion that the tribe representatives could sue in federal court on their own.

Cases involving Indian tribes as plaintiffs present special considerations. The moral and legal obligations of the United States toward Indian tribes place the tribes in a special posture when seeking relief in federal courts. This special posture has been codified in 28 U.S.C. § 1362, which provides that:

> "The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

The primary purpose of § 1362 was to remove the jurisdictional amount in controversy barrier for Indian tribes, and to give tribes the right to sue on their own behalf in any controversy "involving tribal property or matters of tribal sovereignty where the United States declines to do so on a tribe's behalf as trustee. *See Gila River Indian Community v. Henningson, Durham and Richardson,* 626 F.2d 708 (9th Cir. 1980). *Fort Mojave Tribe v. LaFollette,* 478 F.2d 1016 (9th Cir. 1973); *United States v. Alpine Land and Reservoir Company,* 431 F.2d 763 (9th Cir. 1970), *cert. denied,* 401 U.S. 909, 91 S.Ct. 869, 27 L.Ed.2d 807 (1971); *Salt River Pima–Maricopa Indian Community v. Arizona Land & Rock Co.,* 353 F.Supp. 1098 (D. Ariz. 1972). *See also,* 1966 U.S. Code Cong. & Admin. News, p. 3145, 3147.

*Moe v. Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), a Supreme Court decision handed down subsequent to *Moses* and *Agua Caliente Band,* has substantially redefined the basis of fed-

---

the rationale expressed by the Supreme Court in its unanimous decision in *United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). The Court squarely held that very

similar "community action agencies" were not federal instrumentalities. *See also, Perez v. United States,* 594 F.2d 280 (1st Cir. 1979).

eral jurisdiction over Indian claims of unconstitutional state taxation. The *Moe* majority explicitly laid to rest the "federal instrumentality" concept as the proper rationale for allowing Indian tribes to avoid the § 1341 bar. The Court instead construed § 1362 as giving Indians as broad a right to sue as the United States would possess, and as placing the tribes in the same position as the United States when suing over matters of tribal sovereignty. Thus, for the purposes of § 1341, § 1362 explicitly allows the tribe to stand in the shoes of the government. See 425 U.S. at 474, 475. In assessing the impact of *Moe* upon the *Moses* and *Agua Caliente Band* holdings, this court recently stated in *Navajo Tribal Utility Authority v. Arizona Department of Revenue*, 608 F.2d 1228 (9th Cir. 1979), that:

> "While section 1362 has been read to provide a coplaintiff exemption to the operation of section 1341, that coplaintiff exemption arose out of the congressional intent which the Court determined rested in the passage of section 1362 itself."

608 F.2d at 1234. The court went on to hold that a tribal utility authority could not claim any benefit of the § 1362 co-plaintiff exemption because the tribe was not a party to the litigation.[4]

We are thus constrained by these recent developments to hold that the co-plaintiff exemption announced in *Agua Caliente Band* and applied in *Moses* arises solely out of the special jurisdictional grant of § 1362, and does not aid the plaintiffs in this case. The Authority argues that the federal government has a "special interest," analogous to that found in *Moses*, in providing low-income housing. We are not persuaded. While the federal government clearly has a strong interest in low-income housing, it does not have the exclusive and compelling interest which attaches to its oversight of Indian affairs. The chronic shortage of low-income housing is a problem felt by state and local government as acutely as by the federal government, and the shared concern of all renders the protection of federal district court against state taxation unnecessary for low-income housing projects. Without an explicit directive from Congress analogous to § 1362, we are reluctant to extend the "special interest" rationale beyond its application to Indian tribes.

### III. CONCLUSION

Because the United States was not a party to this suit, the court below lacked jurisdiction. Accordingly, the court's order is

REVERSED, with instructions to dismiss the action.

---

4. See also *United States v. State Tax Commission*, 481 F.2d 963, 975 (1st Cir. 1973), which somewhat anticipated the holdings of *Moe* and *Navajo Tribal Utility Authority*.